Filed 8/8/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

|  |  |
|---|---|
| In re GARY DONNELL WILLIAMS,<br><br>on Habeas Corpus. | B252654<br><br>(Los Angeles County<br>Super. Ct. No. NA086234) |

ORIGINAL PROCEEDING on petition for writ of habeas corpus. Petition granted and remanded.

Ronald L. Brown, Public Defender, Albert J. Menaster, Bret Rayburn and Robin Bernstein-Lev, Deputy Public Defenders for Petitioner.

Lawrence Beach Allen & Choi, Paul B. Beach and Matthew P. Allen for Respondent Los Angeles County Sheriff's Department.

Jackie Lacey, District Attorney, Matthew Brown and Roberta Schwartz, Deputy District Attorneys, for Respondent the People.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General and Jennifer M. Kim and Carmen D. Snuggs, Deputy Attorneys General, for Department of Developmental Services as Amicus Curiae on behalf of Respondent Los Angeles County Sheriff's Department.

Enright & Ocheltree, Judith A. Enright and Julie A. Ocheltree for South Central Los Angeles Regional Center as Amicus Curiae.

_____

While awaiting trial on a variety of sex crime charges, petitioner Gary Donnell Williams was declared mentally incompetent to stand trial due to developmental disability. (Pen. Code, § 1370.1.)[1] Pursuant to its statutory obligation, the regional center provided a recommendation to the trial court to place Williams where he was to receive services designed to restore him to competency. (§ 1370, subd. (a)(1)(H)(2).) It determined the Porterville Developmental Center (Porterville or PDC) was best suited to his needs, and the trial court ordered that he be placed there. However, Porterville refused to accept Williams because of safety concerns. In the letter rejecting Williams' placement, Porterville cited recently enacted Welfare and Institutions Code section 6510.5, which provides that "[u]nder no circumstances" can the court commit someone declared incompetent under section 1370.1 to a developmental center if the Department of Developmental Services (DDS) states in writing that the person in question cannot be safely served at that facility. Although the trial court opined that Porterville's refusal to accept Williams appeared to be arbitrary and capricious, it believed that, under the statute in question, it had no authority to place Williams at Porterville.

The court requested both the DDS and the regional center to provide alternatives for Williams' placement. The DDS suggested that an outside vendor could provide services to Williams in county jail. The regional center acknowledged it had previously provided such services in the county jail, but indicated such services cannot be provided for a commitment order under section 1370.1 and refused to recommend it. The regional center maintained that Porterville was the only suitable placement and provided the court with no alternative for Williams' placement. Given no other options, the trial court reluctantly ordered that Williams remain in the Los Angeles County Jail with the local regional center to provide competency services to Williams while incarcerated.

---

[1]  Undesignated statutory references are to the Penal Code and undesignated references to statutory subdivisions are to the subdivisions of section 1370.1.

By way of a petition for a writ of habeas corpus, Williams claims his continued placement in the county jail (1) is not proper under section 1370.1, which limits where someone declared mentally incompetent due to developmental disability may be placed, and (2) violates his right to due process. In addition, Williams argues the trial court may, and should, order Porterville to accept him.

We agree that Williams may not be placed in the county jail for the purpose of receiving competency services. We also agree that, absent a determination that "there is a substantial likelihood that he will recover [his competency] in the foreseeable future" (*In re Davis* (1973) 8 Cal.3d 798, 801), Williams' continued confinement violates his right to due process. However, in light of the clear and unequivocal language in Welfare and Institutions Code section 6510.5, we reject the contention that the trial court may order Williams placed at Porterville if the DDS continues to maintain that he cannot be safely served at Porterville. At the same time, we find the trial court may take steps to ensure that the DDS fulfills its statutory obligation to ensure the regional center meets its duty to provide placement options for the treatment of Williams, a developmentally disabled person. This may include issuing an order to show cause to compel the DDS to offer a placement option for Williams.

The writ petition asks this court to direct that Williams "be placed in lawful custody for treatment, or released." In light of his prayer for relief, and because the record in this case "furnishes no basis for concluding that [Williams is] not likely to respond to treatment . . . , it would be premature for us to order [Williams] released from confinement at this time." (*In re Davis, supra,* 8 Cal.3d at p. 806.)

Accordingly, we grant the petition and direct the trial court (1) within 45 days of finality of this opinion, to order Williams placed in a facility that meets the requirements of section 1370.1, and to ensure that such placement occurs forthwith, and (2) within 120 days of finality of this opinion, order that Williams be released or be subject to alternative (i.e., civil) commitment procedures, unless the trial court determines that there is a substantial likelihood Williams will attain competency in the foreseeable future.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2010, an information was filed, charging then 47-year-old petitioner Gary Donnell Williams with sexual penetration by a foreign object (§ 289, subd. (a)(1)), sexual penetration by a foreign object of someone with a developmental disability (§ 289, subd. (b)), forcible rape (§ 261, subd. (a)(2)), rape of an incompetent person (§ 261, subd. (a)(1)), and sexual battery by restraint (§ 243.4, subd. (a)). A host of prior convictions – mostly theft-related, but including one for sexual battery – were also alleged.

The charges arose out of events that took place in 2004. Williams allegedly boarded a bus and, at one point, seated himself next to a 28-year-old woman with Down Syndrome. During the ride, Williams allegedly convinced the woman that he and she were a couple and he lured her off the bus to a deserted alley, where he sexually assaulted her. Williams was arrested in 2010 and his DNA allegedly matched DNA taken from the victim's clothing following the crimes.

Williams pleaded not guilty, the Public Defender was appointed to represent him and he was remanded in lieu of $1 million bail.

In April 2011, the trial court declared a doubt regarding Williams' competence and criminal proceedings were suspended. In August of that year, the trial court found Williams incompetent to stand trial pursuant to section 1370.1, which applies when a defendant is declared mentally incompetent due to a developmental disability. The court referred Williams to the South Central Los Angeles Regional Center (SCLARC), which was directed to examine Williams in the county jail and to report to the court pursuant to section 1370.1. That section requires the court to consider the regional center's recommendation for placement before making a final placement decision.[2] (Subd. (a)(1)(B)(i); see also subd. (a)(1)(H)(2).)

---

[2]    Regional centers are operated by private nonprofit community agencies and are responsible for coordinating the delivery of services for developmentally disabled persons. (See Welf. & Inst. Code, § 4620; *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 486-488.) Regional centers are monitored by the DDS to ensure they meet their

(Fn. continues on next page)

Little progress was made with respect to Williams' placement over the next approximately 15 months. In November 2012, the SCLARC sent a letter to Williams' counsel advising that Williams "has been assessed and determined eligible for Regional Center services." The record is not entirely clear why it took the SCLARC approximately 15 months from the trial court's finding of incompetency to make this determination. However, the minute orders reflect that the trial court diligently conducted progress hearings on an almost monthly basis. Initially, the court continued the matter on several occasions because the SCLARC apparently needed additional time to evaluate Williams. At least some of the subsequent continuances were due to Williams being a "miss out," most likely for medical reasons, including Williams' need to receive dialysis several times per week.

In January 2013, the SCLARC sent a letter to the trial court, advising that "Mr. Williams was made eligible to receive services in 2012 with a diagnosis of Mild Mental Retardation" and that, "[s]ince his eligibility, Mr. Williams has been incarcerated and has not participated in any SCLARC funded programs." The SCLARC also stated in the letter that "[d]ue to the nature of Mr. Williams['] offense[s] as well as a [section] 290 Sex Registrant Status, The Regional Center cannot find an appropriate community placement, as all residential facilities are within a quarter of a mile from schools." In addition, the SCLARC reported that lockdown facilities had advised, based on the nature of the offenses charged and Williams' sex registrant status, that Williams was "at high risk to offend with the more vulnerable population at these sites." The letter concluded with a recommendation that "Williams be ordered [placed in the] Porterville Developmental Center."

---

statutory, regulatory, and contractual obligations in providing services to persons with developmental disabilities. (Welf. & Inst. Code, §§ 4434, 4501.)

The trial court acted promptly on the SCLARC's recommendation. In January 2013, just one day after the date of the SCLARC's letter, the trial court ordered Williams committed to Porterville, where he was to be evaluated pursuant to section 1370.1.[3]

In February 2013, the trial court ordered the Los Angeles County Sheriff's Department (Sheriff) to release Williams' medical records to the regional center. However, at a hearing that took place exactly one month later, Williams' counsel advised the trial court that the regional center was still waiting for Williams' medical records.

At the end of April 2013, the SCLARC sent a letter to the trial court, advising that Williams continued to be incarcerated in the county jail and that his case "is to be reviewed by the Porterville Development Center Clinical Team for placement approval and placement on their waiting list." An assessment attached to the letter indicated that Williams' diagnosis was "moderate" mental retardation. The assessment also noted that Williams has "end-stage renal disease" and receives dialysis three times per week.

Minutes from a hearing that took place in early May 2013 reflect that Williams was still in the county jail "awaiting being transported to Porterville Development Center." The minutes noted that Williams "will be placed on a waiting list for Porterville. The wait . . . time is 6 to 9 months." Although not entirely clear, it appears this assertion was based on statements from a representative of the SCLARC who was present at the hearing. The matter was continued to June 2013.

In late May 2013, the Acting Community Liaison Representative for the Porterville Regional Project sent a letter to the trial court (hereafter the rejection letter), advising that Porterville had assessed Williams for placement based on information it had received from the SCLARC. According to the letter, an assessment "team determined that Mr. Williams cannot be Safely Served at PDC." The letter then quoted Welfare and

---

[3] One month later, the trial court corrected its minute order nunc pro tunc to replace the Porterville commitment with commitment to the regional center. However, this was a mere technical correction. It is clear from the record that the trial court still intended for Williams to be transported to Porterville. For simplicity, we will refer to the commitment as being to Porterville.

Institutions Code section 6510.5, which provides: "Under no circumstances shall the court order placement of a person described in this article or a dangerous person committed pursuant to Section 1370.1 of the Penal Code to a developmental center if the department [DDS] has specifically notified the court in writing that the individual cannot be safely served in that developmental center."

The letter noted that Porterville's patient population is "challenged and very susceptible." The letter went on to describe Williams' criminal history and two psychological assessments performed on Williams in 2011 (before he was found mentally incompetent), concluding with the following:

> "Under all the circumstances, Mr. Williams presents as a person who would be noncompliant to treatment, would engage in malingering behaviors, and who would be manipulative and take advantage of less capable individuals such as those housed at [Porterville]. Mr. Williams['] demonstrated inclinations, along with his long history of criminal behavior and offenses provide a very substantial risk to those consumers currently served in the Secure Treatment Program at [Porterville]. For these reasons [Porterville's] clinical team has determined that Mr. Williams cannot be adequately and safely served at [Porterville].

> "Accordingly, [Welfare and Institutions Code] Section 6510.5 precludes Mr. Williams' placement at [Porterville] as he is 'a dangerous person committed pursuant to section 1370.1 of the Penal Code.' Please regard this letter as written notification that Mr. Williams cannot be safely served in the Porterville Development Center."

In July 2013, the trial court held a hearing with the participation of, among others, a SCLARC representative and the Porterville Acting Community Liaison Representative who signed the rejection letter. During the hearing, the court expressed skepticism regarding Porterville's determination that Williams could not be safely housed there. It observed that it had "seen some people accused of very dangerous crimes go to Porterville who could walk" and who were "physically, basically a hundred percent." The court noted that Williams is an "older gentleman" who is on dialysis and who has sometimes appeared in court on a gurney. The court characterized Williams as "one of

7

the most physically incapacitated people that I have seen in this courtroom and this is a wheelchair courtroom." The Deputy District Attorney also observed that, during the years she has been assigned to the case, Williams "has always been in a wheelchair" and he "seem[s] to be very limited in his physical capacity, coupled with his medical situation." The Porterville representative confirmed that "numerous" people charged with sex offenses are housed at Porterville.

The District Attorney maintained that Porterville is "the correct institution to actually house and take the defendant pursuant to Welfare and Institutions Code section 6501," which, as discussed below, provides that, when dealing with persons charged with violent felonies who are committed under section 1370.1, priority should be given to placement at Porterville.

Counsel for the DDS advised the trial court that, besides Porterville, she did not believe there was a placement that could provide services to Williams while adequately protecting the community.

The representative who signed the rejection letter informed the court that Porterville has the capacity to accept 170 persons and that it was currently "at capacity." The representative emphasized, however, that this is "not the reason that [Williams' placement at Porterville] was denied. He was denied based on the fact that [under Welfare and Institutions Code section 6510.5,] we had the discretion to do so."

The court then scheduled an order to show cause hearing as to why Williams should not be ordered placed in Porterville "at a time convenient."

In August 2013, the court vacated its order to show cause for technical reasons. However, the court continued to discuss the merits of the case with counsel for the various interested parties in an effort to find a solution to the placement dilemma. Among other things, the court stated that Porterville's decision to reject Williams "appears to be arbitrary and capricious" but the court believed that Welfare and Institutions Code section 6510.5 prevented it from placing Williams in Porterville. The court expressed its belief that under section 1370.1, the DDS had to come up with an alternative treatment plan.

8

Counsel for the DDS maintained that under section 1370.1, "the Regional Center would be the proper party to make a recommendation for alternate service." Counsel for the DDS suggested that an outside vendor could provide services to Williams in the county jail.

Counsel for the SCLARC stated that the regional center "can arrange for a vendor to go in county jail. It has been done in other cases that we have; however, that's usually pending a placement at Porterville." Counsel for the SCLARC added, however, that "[t]he commitment order under [section] 1370.1 can't be county jail, the way I read [the statute]."

Williams' counsel also maintained that placement in the county jail is not proper under section 1370.1.

The court continued the matter to September 2013 to consider alternative placement options.

In late August 2013, Williams filed a petition for a writ of habeas corpus in the trial court, seeking his "immediate release from his present unlawful confinement." Williams maintained that his continued confinement is unlawful because there has been no determination that there is a substantial likelihood he will attain competency in the foreseeable future.

The trial court directed the District Attorney to file a return. In the return, the District Attorney argued that Williams could and should remain in county jail and should receive competency training there. Alternatively, the District Attorney asked that the court place Williams in Patton State Hospital.

The SCLARC also filed a brief in which it argued that "the jail is not a placement option under Penal Code section 1370.1 and the regional center is not recommending it as a placement." Although stopping short of expressly stating that the court should order Williams placed in Porterville notwithstanding the rejection letter, the SCLARC maintained that Porterville is the only secure treatment facility where Williams could be placed.

9

In late September 2013, after conducting a hearing on the matter, the trial court issued a written order denying the petition. The court concluded that, in light of Welfare and Institutions Code section 6510.5, it had no authority to place Williams in Porterville. The court then ruled that "[t]he only alternative to releasing the petitioner is for this court to order the SCLARC to provide competency services in the Los Angeles County Jail, which does qualify pursuant to Penal Code section 1369.1 as a 'treatment facility,' and to submit to the court the ninety[-]day evaluation required by Penal Code section 1370.1(b)(1)."[4]

Two months later, Williams filed a petition for a writ of habeas corpus in this court. This court summarily denied the petition, but the Supreme Court granted Williams' petition for review and transferred the matter to this court with directions to issue an order to show cause why Williams' continued placement in county jail is not contrary to subdivision (a)(1)(B)(i), and why his continued confinement without a determination whether there is a substantial likelihood he will attain competency is not a denial of due process. We issued such an order to show case, received separate returns from the Sheriff and the District Attorney, as well as a traverse from petitioner.

In addition, we invited and received amicus curiae briefs from the DDS and the SCLARC, each of which addressed the question whether the trial court had authority to order Porterville to accept Williams notwithstanding Porterville's invocation of Welfare and Institutions Code section 6510.5. The DDS maintains that the trial court had no such authority. The SCLARC does not directly address the question, though it maintains that Williams may challenge Porterville's decision to reject his placement through the

---

[4]     Section 1369.1, subdivision (a), provides in pertinent part that, as used in the Penal Code chapter dealing with competency issues, the term "treatment facility" includes a county jail. We discuss the significance of this provision below.

Lanterman Act's administrative fair hearing procedures.[5]  The DDS also suggests

Williams may challenge the rejection letter by way of such an administrative proceeding.

## DISCUSSION

**A.      Placement of Persons Declared Mentally Incompetent Due to Developmental Disability**

### 1.       Applicable Legal Principles

A defendant may be found incompetent to stand trial due to a mental disorder or a

developmental disability.[6]  (§ 1367, subd. (a).)  Different procedures apply in each

---

[5]      " '[T]he Lanterman Act guarantees an applicant for or recipient of services or his or her representative "who is dissatisfied with any decision or action of [a regional center or developmental center]" the right to an administrative fair hearing.  [Citation.]' (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1459 (*Whitley*); see [Welf. & Inst. Code,] § 4704.)  The fair hearing procedures are designed to decide 'all issues concerning the rights of persons with developmental disabilities to receive services under [the Lanterman Act].'  ([Welf. & Inst. Code,] § 4706, subd. (a).)  The fair hearing procedures include  'detailed provisions for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing.  [Citations.]'  (*Whitley*, at pp. 1459–1460.) If the claimant chooses to proceed to an administrative fair hearing, the Lanterman Act guarantees the claimant a prehearing exchange of potential witnesses and documentary evidence, the opportunity to present witnesses and evidence, the opportunity to cross-examine all opposing witnesses, the right to appear through counsel or other representatives, and a written decision by the hearing officer.  (*Whitley*, at pp. 1460–1461.) Either side may seek judicial review of the administrative decision through a writ of administrative mandamus." (*Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 423-424, fourth and sixth brackets added.)

         While Williams is free to explore this option, we express no opinion concerning the availability of such administrative review in this case.

[6]      " '[D]evelopmental disability' means a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely and constitutes a substantial handicap for the individual, and shall not include other handicapping conditions that are solely physical in nature.  As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include intellectual disability, cerebral palsy, epilepsy, and autism.  This term shall also include handicapping conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an

(Fn. continues on next page)

instance. Section 1370 applies to a person found incompetent due solely to mental disorder, while section 1370.1 applies to a person found incompetent due to developmental disability and to "a person who is incompetent as a result of a mental disorder, but is also developmentally disabled." (§ 1367, subd. (b).)

Sections 1370 and 1370.1 contain many similarities, and even some virtually identical provisions, but there are some important differences. One of those differences is relevant to this writ proceeding. It concerns the placement options available to the trial court when deciding where the incompetent person should receive services designed to help that person attain competency.

We focus on the statute applicable to this case – section 1370.1. Under this statute, "[i]f the defendant is found mentally incompetent and is developmentally disabled, the trial or judgment shall be suspended until the defendant becomes mentally competent." (Subd. (a)(1)(B).)

Subdivision (a)(1)(B) specifies the placement options available to the court after a finding of incompetency. They are contained in three paragraphs – (i) through (iii), respectively. The main placement provision is contained in paragraph (i), which provides in pertinent part:

> "In the meantime [i.e., until the defendant becomes mentally competent], the court shall order that the mentally incompetent defendant be delivered by the sheriff or other person designated by the court to [1] a state hospital or developmental center for the care and treatment of the developmentally disabled or [2] any other available residential facility approved by the director of a regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code as will promote the defendant's speedy attainment of mental competence, or [3] be placed on outpatient status pursuant to Section 1370.4 and Title 15 . . . ."[7] (Subd. (a)(1)(B)(i).)

intellectual disability, but shall not include other handicapping conditions that are solely physical in nature." (Subd. (a)(1)(H).)

[7]    This text of subdivision (a)(1)(B)(i) begins with the following sentence: "Except as provided in clause (ii) or (iii), the court shall consider a recommendation for placement, which recommendation shall be made to the court by the director of a regional

(Fn. continues on next page)

12

center or designee." When read literally, the "[i]n the meantime" clause at the start of the following sentence, would seem to refer to the relatively brief period before the trial court receives and considers the regional center's placement recommendation. This would mean that the three placement options listed in clause (i) limit only where an incompetent defendant may be placed on a temporary basis; i.e., until the court can make a more "permanent" placement decision based on the regional center's recommendation. This would then leave the court free to make its more "permanent" placement decision without having to adhere to the restrictions imposed in subdivision (a)(1)(B)(i).

No party to this writ proceeding has advocated such a construction, which we consider prudent. Looking at the entire statute, it is clear that "in the meantime" refers to the period until the defendant attains competency. Thus, subdivision (a)(1)(H)(2) provides that an incompetent defendant may not even be admitted to one of the facilities listed in subdivision (a)(1)(B)(i) before the regional center has performed the court-ordered evaluation that is required for its placement recommendation. As a result, the trial court cannot even place the incompetent defendant in one of the listed facilities before receiving the regional center's recommendation. In addition, it would be odd if the Legislature had placed relatively strict limits on where a mentally incompetent person may be placed on a *temporary* basis, only to place virtually no restrictions on the more "permanent" placement after receipt of the regional center's recommendation. Finally, the "parallel" statute that applies when someone is declared incompetent due solely to a mental disorder (§ 1370) contains the same "in the meantime" clause. In that statute, there is no question the language refers to the period until the person is restored to competency because the "in the meantime" clause follows the statement that, if the defendant is found mentally incompetent, trial should be suspended until the person becomes mentally competent. That is also the way the comparable provision appeared in section 1370.1 until the Legislature amended the statute in 1980 to add a provision requiring the court to consider the regional center's recommendation. (See Stats. 1980, ch. 547, § 9; Stats. 1980, ch. 859, § 2; Stats. 1980, ch. 1253, § 2.) Unfortunately, when it did so, the drafters apparently failed to recognize that some grammatical adjustments should be made to avoid confusion over the meaning of the "in the meantime" clause. Nonetheless, as this case illustrates, courts and the bar have continued to construe the clause rationally and in accordance with the Legislature's obvious intent, namely, as referring to the period until the incompetent person attains competency. Consistent with the rules of statutory construction, we will do so as well. (See *Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 ["[F]undamental task [in construing a statute] is to ascertain the Legislature's intent so as to effectuate the purpose of the statute" and, while courts "begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed 'in the context of the statute as a whole and the overall statutory scheme[;]' " court must "choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat

(Fn. continues on next page)

13

In this case, we are not concerned with the third of these options because, under section 1601, subdivision (a), persons charged with certain specified offenses are not eligible for outpatient status until they have "actually been confined in a state hospital or other treatment facility for 180 days or more . . . ." One of the specified offenses is forcible rape. Because Williams was charged with forcible rape, he was not eligible for outpatient status. (See also *People v. Superior Court* (*Lopez*) (2005) 125 Cal.App.4th 1558, 1563 (*Lopez*) [trial court erred by placing incompetent defendant directly in outpatient treatment because he was facing trial on one of the offenses listed in section 1601, subdivision (a)].)

Therefore, the two placement options that were available to the trial court under subdivision (a)(1)(B)(i) were (1) "a state hospital or developmental center for the care and treatment of the developmentally disabled" or (2) "any other available residential facility approved by the director of a regional center for the developmentally disabled . . . as will promote the defendant's speedy attainment of mental competence."

The two remaining paragraphs in subdivision (a)(1)(B) authorize "alternative placement[s]" beyond those available under paragraph (i), but they apply only under limited circumstances. Paragraph (ii) of subdivision (a)(1)(B) provides:

> "However, if the action against the defendant who has been found mentally incompetent is on a complaint charging a felony offense specified in Section 290 [i.e., an offense for which sex offender registration is required upon conviction], the prosecutor shall determine whether the defendant [1] previously has been found mentally incompetent to stand trial pursuant to this chapter on a charge of a Section 290 offense, or [2] whether the defendant is currently the subject of a pending Section 1368 proceeding arising out of a charge of a Section 290 offense. If either determination is made, the prosecutor shall so notify the court and defendant in writing. After this notification, and opportunity for hearing, the court shall order that the defendant be delivered by the sheriff to a state hospital or other secure treatment facility for the care and treatment of the developmentally disabled unless the court makes specific findings on the record that an

the statute's general purpose, and avoiding a construction that would lead to absurd consequences"].)

14

*alternative placement* would provide more appropriate treatment for the defendant and would not pose a danger to the health and safety of others." (Subd. (a)(1)(B)(ii), italics added.)

In *Lopez, supra*, 125 Cal.App.4th at pages 1563 through 1565, the Court of Appeal construed a virtually identical provision in the "parallel" statute that applies when someone is declared incompetent due solely to a mental disorder – section 1370, subdivision (a)(1)(B)(ii). The court observed that the provision "applies only if the defendant has been found mentally incompetent to stand trial on a section 290 offense *and* he falls into one of two prerequisite categories: (1) he previously was found incompetent to stand trial on a section 290 offense, or (2) he 'is currently the subject of a *pending Section 1368 proceeding* arising out of a charge' listed in section 290." (*Lopez, supra*, 125 Cal.App.4th at p. 1564.)

Before the defendant in *Lopez* was declared incompetent, he was facing trial on a felony offense listed in section 290, but "there [wa]s nothing in the record to indicate defendant was previously found incompetent to stand trial on an offense listed in section 290." (*Lopez, supra,* at p. 1564.) Therefore, the first prerequisite category could not be invoked. "As to the second category – whether the defendant 'is currently the subject of a pending Section 1368 proceeding' based on an offense listed in section 290 –" the court in *Lopez* concluded that "this language refers to a *separate* proceeding from the one before the trial court." (*Ibid.*)

The court explained:

> "Any other interpretation of [section 1370,] subdivision (a)(1)(B)(ii) would render much of its language surplusage, ' " '[a] construction . . . to be avoided.' " ' " (*California Insurance Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2003) 112 Cal.App.4th 358, 366.) For example, if the fact that a defendant has been found incompetent to stand trial for a section 290 offense in the current proceeding were sufficient to satisfy the requirement of a 'pending section 1368 proceeding,' this second prerequisite category would apply in every case, rendering it unnecessary for the prosecuting attorney to ever make a determination whether either of the two prerequisite categories applied." (*Lopez, supra*, 125 Cal.App.4th at p. 1565, first brackets and ellipsis in original.)

15

The Supreme Court denied review in *Lopez* and the Legislature has not made any changes to the statutory language at issue in *Lopez* since that case was decided in 2005.

Turning back to the placement options in subdivision (a)(1)(B), the third and final paragraph listing the placement options is paragraph (iii), which authorizes the trial court to consider "alternative placement[s]" only if, among other things, the defendant was denied bail.[8]

## 2. *Application to Petitioner's Commitment in This Case*[9]

We first consider whether Williams' current placement in the county jail is proper under section 1370.1. We hold it is not.

---

[8]  Subdivision (a)(1)(B)(iii) provides:
"If the action against the defendant who has been found mentally incompetent is on a complaint charging a felony offense specified in Section 290 and the defendant has been denied bail pursuant to subdivision (b) of Section 12 of Article I of the California Constitution because the court has found, based upon clear and convincing evidence, a substantial likelihood that the person's release would result in great bodily harm to others, the court shall order that the defendant be delivered by the sheriff to a state hospital for the care and treatment of the developmentally disabled unless the court makes specific findings on the record that an alternative placement would provide more appropriate treatment for the defendant and would not pose a danger to the health and safety of others."

[9]  Preliminarily, we address two procedural issues raised by the DDS. First, the DDS suggests this petition may soon become moot because William's three-year maximum confinement date is approaching. That date has not yet arrived. If and when it does, the issue can be raised in the trial court.
Second, the DDS maintains that "the issue of whether the [DDS] properly exercised its discretion [when it issued the rejection letter and invoked Welfare and Institutions Code] Section 6510.5 is not before this Court." That is correct. However, the question whether the trial court had authority to even consider whether the DDS properly exercised its discretion is before this court (in the context of this court's consideration of the propriety of the trial court's placement order), and the parties, including the DDS, have briefed this issue. And, contrary to the DDS's contention, the Supreme Court did not "grant[] review on selected issues" before transferring the matter to this court with directions to issue an order to show cause. Thus, the Supreme Court's order does not preclude this court from considering the trial court's authority to direct the DDS to accept Williams at Porterville.

16

a. <u>Subdivision (a)(1)(B)(i)</u>

The placement options in section 1370.1 are contained in subdivision (a)(1)(B), with the main placement provision being in paragraph (i). As discussed above, that paragraph contains three placement options: (1) "a state hospital or developmental center for the care and treatment of the developmentally disabled or" (2) "any other available residential facility approved by the director of a regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code as will promote the defendant's speedy attainment of mental competence," or (3) "outpatient status."

The first and last of these options require little discussion. A county jail is not a "state hospital or developmental center for the care and treatment of the developmentally disabled" and no party argues that it is. And, as noted, under section 1601, subdivision (a), Williams was not eligible for outpatient status because he was charged with forcible rape.

Turning to the second option, we are uncertain whether the county jail could theoretically qualify as a "residential facility approved by the director of a regional center for the developmentally disabled established under Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code as will promote the defendant's speedy attainment of mental competence." In this case, the director of the SCLARC has not approved the county jail under this provision, so it was not an option available to the trial court.

At oral argument, counsel for the DDS stated that the county jail or other facility could qualify as such a residential facility if approved by the regional center. Counsel for the SCLARC likewise seemed to concede that the county jail could qualify as such a residential facility if its director approved it as such. However, counsel maintained that the SCLARC could not approve the county jail for Williams' placement because doing so would be inconsistent with its obligations under Welfare and Institutions Code section 4648, subdivision (b), to advocate for, and protect, persons with developmental disabilities.

17

Perhaps because it was only a theoretical possibility, the District Attorney and the Sheriff do not argue Williams' placement in the county jail could be proper if the regional center approved it as a residential facility. However, Williams claims it would not be proper because the county jail does not meet the requirements in "Division 4.5 (commencing with Section 4500) of the Welfare and Institutions Code."

Because the propriety of such a placement is not before us, and because this point was not fully addressed by the parties in their briefing, we are not in a position to determine whether the county jail could qualify as a residential facility for Williams' placement if the SCLARC approves it. However, we do not preclude the possibility that a "residential facility" under subdivision (a)(1)(B)(i) may include a correctional facility if it meets the requirements of Division 4.5 of the Welfare and Institutions Code and it is approved by the regional center.

b. Subdivision (a)(1)(B)(ii)

We turn next to paragraph (ii) of subdivision (a)(1)(B). It provides:

> "However, if the action against the defendant who has been found mentally incompetent is on a complaint charging a felony offense specified in Section 290 [i.e., an offense for which sex offender registration is required upon conviction], the prosecutor shall determine whether the defendant [1] previously has been found mentally incompetent to stand trial pursuant to this chapter on a charge of a Section 290 offense, or [2] whether the defendant is currently the subject of a pending Section 1368 proceeding arising out of a charge of a Section 290 offense. If either determination is made, the prosecutor shall so notify the court and defendant in writing. After this notification, and opportunity for hearing, the court shall order that the defendant be delivered by the sheriff to a state hospital or other secure treatment facility for the care and treatment of the developmentally disabled unless the court makes specific findings on the record that an *alternative placement* would provide more appropriate treatment for the defendant and would not pose a danger to the health and safety of others." (Subd. (a)(1)(B)(ii), italics added.)

The Sheriff and the DDS argue that this provision applies here. According to the case law we discussed above, this provision "applies only if the defendant has been found mentally incompetent to stand trial on a section 290 offense *and* he falls into one of two

18

prerequisite categories: (1) he previously was found incompetent to stand trial on a section 290 offense, or (2) he 'is currently the subject of a *pending Section 1368 proceeding* arising out of a charge' listed in section 290." (*Lopez, supra*, 125 Cal.App.4th at p. 1564 [construing virtually identical language in section 1370, subd. (a)(1)(B)(ii)].)

Although Williams was facing trial on one or more felony offenses listed in section 290, there is nothing in the record to indicate he was previously found incompetent to stand trial on an offense listed in section 290. Therefore, the first prerequisite category may not be invoked. As for the second category, and as discussed above, the court in *Lopez* concluded that "this language refers to a *separate* [pending] proceeding from the one before the trial court." (*Lopez, supra*, 125 Cal.App.4th at p. 1564.) There is no indication that Williams was the subject of another pending section 1368 proceeding arising out of a charge listed in section 290.[10]

Thus, based on the record before us, we cannot find Williams' placement is appropriate under subdivision (a)(1)(B)(ii) either. However, if the District Attorney failed to assert a factual basis for applying the provision as we have just explained, it may do so after the matter is remanded to the trial court.

    c. Subdivision (a)(1)(B)(iii)

Paragraph (iii) of subdivision (a)(1)(B) allows housing in a state hospital for the care and treatment of the developmentally disabled, and also for "alternative placement" upon the court making specific findings on the record. However, it applies only when a defendant has been denied bail because of "a substantial likelihood that the person's release would result in great bodily harm to others, . . ." This subdivision cannot be used in this case because Williams was not denied bail.

---

[10]    Neither the Sheriff nor the DDS discuss *Lopez* in their briefing. In contrast, the District Attorney acknowledges and does not take issue with the holding in *Lopez*.

19

d.  Other Arguments

    1)    Section 1369.1

The District Attorney argues Williams is properly placed in county jail because of a 2012 amendment to section 1369.1 pursuant to which a " 'treatment facility' includes a county jail." (§ 1369.1, subd. (a).)  As we now explain, while a county jail may qualify as a "treatment facility" for certain purposes, it does not qualify as a placement option under section 1370.1.

First, the only reference to "treatment facility" in subdivision (a)(1)(B) – which, as noted, contains the placement options in section 1370.1 – is contained in paragraph (ii). That paragraph gives the court the option to place someone in a "secure *treatment facility* for the care and treatment of the developmentally disabled . . . ."  (Subd. (a)(1)(B)(ii), italics added.)  As we have already explained, however, based on the record before us, Williams does not qualify for placement under paragraph (ii) of subdivision (a)(1)(B).

Second, the legislative history demonstrates that the amendment to section 1369.1 was meant to apply to the placement of defendants found mentally incompetent due to mental disorder under section 1370, not to the placement of defendants found mentally incompetent due to developmental disability under section 1370.1.

Section 1369.1 was enacted in 2007 and became effective on January 1, 2008. Initially, it dealt only with the ability of county jails to administer antipsychotic medications.  When enacted, subdivision (a) of the statute provided in pertinent part:

> "As used in this chapter, *for the sole purpose of administering antipsychotic medication pursuant to a court order*, 'treatment facility' includes a county jail.  Upon the concurrence of the county board of supervisors, the county mental health director, and the county sheriff, the jail may be designated to provide medically approved medication to defendants found to be mentally incompetent and unable to provide informed consent *due to a mental disorder*, pursuant to this chapter. . . . The provisions of Sections 1370 and 1370.01 shall apply to antipsychotic medications provided in a county jail, provided, however, that the maximum period of time a defendant may be treated in a treatment facility

20

pursuant to this section shall not exceed six months."[11] (Former § 1369.1, subd. (a), italics added.)

Thus, section 1369.1 dealt only with the ability of county jails to administer medication, and it was specifically limited to persons declared mentally incompetent due to a mental disorder (not due to developmental disability). That explains why the statute cites only sections 1370 and 1370.01 (both of which deal with mental incompetence due to mental disorder), and makes no reference to section 1370.1.

The language upon which the trial court in this case and the District Attorney rely was added by way of a 2012 amendment, which went into effect in June of that year. (Stats. 2012, ch. 24, § 25.) The only substantive change was the deletion of the phrase "for the sole purpose of administering antipsychotic medication pursuant to a court order." Thus, subdivision (a) now provides:

> "As used in this chapter, 'treatment facility' includes a county jail. Upon the concurrence of the county board of supervisors, *the county mental health director*, and the county sheriff, the jail may be designated to provide medically approved medication to defendants found to be mentally incompetent and unable to provide informed consent *due to a mental disorder*, pursuant to this chapter. . . . . The provisions of Sections 1370 and 1370.01 shall apply to antipsychotic medications provided in a county jail, provided, however, that the maximum period of time a defendant may be treated in a treatment facility pursuant to this section shall not exceed six months." (§ 1369.1, subd. (a), italics added.)

As can be seen, this subdivision refers only to persons suffering from a "mental disorder." It makes no reference to persons suffering from a developmental disability.[12]

---

[11] Section 1370.01 contains procedures that apply only to persons charged with misdemeanors. (See § 1367, subd. (b).)

[12] In addition, as the SCLARC notes in its amicus brief, the statute refers to the "county mental health director" and makes no reference to the regional center director.

21

In addition, as part of the same 2012 amendment to section 1369.1, the Legislature also amended section 1370, the statute dealing with those declared mentally incompetent *due to a mental disorder*. Specifically, the Legislature amended that statute to provide that a treatment facility where such persons may be placed includes the county jail. Section 1370, subdivision (a)(1)(B)(i), now provides:

> "In the meantime [pending restoration to sanity], the court shall order that the mentally incompetent [due to mental disorder] defendant be delivered by the sheriff [1] to a state hospital for the care and treatment of the mentally disordered, or [2] to any other available public or private *treatment facility*, *including a local county jail treatment facility*, approved by the community program director that will promote the defendant's speedy restoration to mental competence, or [3] placed on outpatient status as specified in Section 1600." (§ 1370, subd. (a)(1)(B)(i)), italics added.)

Thus, section 1370, subdivision (a)(1)(B)(i), specifically authorizes placement in a "treatment facility," and specifically provides (as of June 2012) that a treatment facility includes a county jail. (See also § 1370, subd. (a)(1)(F)(2)(A) [discussing placement in a county jail treatment facility].)

In contrast, section 1370.1 was *not* amended in June 2012 when the Legislature amended sections 1369.1 and 1370 to provide that treatment facility includes a county jail. Indeed, section 1370.1 does not include a single reference to "jail."

The District Attorney argues that, although the Legislature amended only section 1370, and not section 1370.1, to expressly authorize placement in a county jail, this court should interpret section 1370.1 as authorizing such placement "in order to harmonize this section [1370.1] with section 1370." We decline the invitation to rewrite the statute. As the Supreme Court explained in a different context, "plaintiffs' argument would require us to adopt the following implausible line of reasoning: When two parallel statutes use nearly identical language, and when the Legislature amends one but not the other, and when the amendment does not merely clarify existing law but actually changes the law, we should nevertheless continue to give the two statutes the same meaning, treating them as if the Legislature had actually amended both . . . ." (*Miklosy v. Regents*

22

*of University of California* (2008) 44 Cal.4th 876, 894.) Moreover, the discussion above demonstrates that the 2012 amendment to section 1369.1 was meant to apply only to the placement of those found mentally incompetent due solely to a mental disorder.

The language in subdivision (a)(1)(B)(i) is clear. "If the [statutory] language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) No party contends that construing the subdivision according to its plain meaning would lead to absurd consequences. We therefore decline to construe subdivision (a)(1)(B)(i) to include an amendment the Legislature chose not to add.

### 2) Subdivision (e)

Although not expressly relying on subdivision (e) for an alternative argument that Williams is appropriately placed in county jail, the District Attorney contends it gives rise to an "implication that correctional facilities may be an appropriate treatment facility if the circumstances warrant." Subdivision (e) provides:

> "For the purpose of this section, 'secure treatment facility' shall not include, except for state mental hospitals, state developmental centers, and correctional treatment facilities, a facility licensed pursuant to Chapter 2 (commencing with Section 1250) of, Chapter 3 (commencing with Section 1500) of, or Chapter 3.2 (commencing with Section 1569) of, Division 2 of the Health and Safety Code, or a community board and care facility."

As discussed, while the term "secure treatment facility" appears in subdivision (a)(1)(B)(ii), Williams' placement cannot be supported under this provision. Subdivision (a)(1)(B)(i) is the only provision containing the placement options available in this case. It makes no reference to "secure treatment facility." Therefore, what may or may not be included in the term "secure treatment facility" is irrelevant.

23

In sum, Williams' placement in the county jail cannot currently be upheld under any of the three provisions in subdivision (a)(1)(B), the subdivision that contains the *only* placement options available under section 1370.1.[13]

**B.      Due Process Limits on the Commitment of Persons Declared Mentally Incompetent to Stand Trial**

*1.       Applicable Legal Principles*

As noted above, pending restoration to sanity, the incompetent defendant is to be placed in an authorized facility for the purpose of receiving services designed to help that person attain competency.  (Subd. (a)(1)(B).)  Previously, such placement could last indefinitely.  (See *In re Polk* (1999) 71 Cal.App.4th 1230, 1235 ["Before 1974, a criminal defendant found mentally incompetent to stand trial in California was committed to a state hospital until he regained competence and thus faced the possibility of an indefinite commitment without regard to the crime with which he was charged or his prognosis for recovery of competence"].)  However, there are now both constitutional and statutory time limits on such placements.

In *Jackson v. Indiana* (1972) 406 U.S. 715, 731 (*Jackson*), the United States Supreme Court held that a state's "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial does not square with the Fourteenth Amendment's guarantee of due process."  The court held that, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."  (*Id.* at p. 738.)  More specifically, the court held that a "person charged by a State with a criminal offense who is committed

---

[13]      Some parties cite to the services Williams has been receiving in the county jail and argue, depending on their respective positions, that those services are or are not adequate. Even assuming it would be appropriate for us to consider such recent developments – many of which involve facts occurring after we issued our order to show cause – the adequacy of the services provided to Williams in the county jail is irrelevant because we have determined Williams' placement in the county jail is not authorized.  We express no opinion regarding the quality of the services provided to Williams in the county jail.

solely on account of his incapacity to proceed to trial cannot be held more than *the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future*. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." (*Ibid.*, italics added.)

In *In re Davis, supra*, 8 Cal.3d 798, the California Supreme Court "acknowledge[d] that some provision must be made to assure that [incompetent defendants] do not face an indefinite commitment without regard to the likelihood that they will eventually regain their competence" and it proceeded to "adopt the rule of the *Jackson* case that no person charged with a criminal offense and committed to a state hospital solely on account of his incapacity to proceed to trial may be so confined more than a reasonable period of time necessary to determine whether there is a substantial likelihood that he will recover that capacity in the foreseeable future." (*In re Davis*, *supra*, 8 Cal.3d at p. 801.)

The Supreme Court went on to specify procedures that should apply to future commitments:

> "in order to comply with *Jackson's* demands the trial courts should henceforth direct the appropriate state hospital authorities to commence an immediate examination of the person committed and, within a reasonable time, report to the court the result of that examination and estimate the additional time probably necessary to restore the person to competence. Should the person committed desire to challenge the report's conclusions, reasonable opportunity should be provided him to do so.

> "If the report discloses that there exists no reasonable likelihood that the person will recover his competence to stand trial in the foreseeable future, then the court should either order him released from confinement or initiate appropriate alternative commitment proceedings under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.). On the other hand, if the report is optimistic regarding the person's probable recovery, the court should continue his commitment and require the hospital authorities to furnish, within a reasonable time, additional periodic

reports regarding the person's progress." (*In re Davis, supra*, 8 Cal.3d at pp. 806-807, fns. omitted.)

In 1974, the Legislature responded to the *Jackson* and *Davis* decisions by substantially amending the statutes governing incompetency commitments. (See *Hale v. Superior Court* (1975) 15 Cal.3d 221, 223.) Subdivision (b)(1) now provides for specific time limits to ensure that a mentally incompetent person is not committed if there is no substantial likelihood of attaining competency. The subdivision provides in pertinent part:

> "Within 90 days of admission of a person committed pursuant to subdivision (a), the executive director or designee of the state hospital, developmental center, or other facility to which the defendant is committed, . . . shall make a written report to the committing court and the regional center director or a designee concerning the defendant's progress toward becoming mentally competent. If the defendant has not become mentally competent, but the report discloses a substantial likelihood the defendant will become mentally competent within the next 90 days, the court may order that the defendant shall remain in the state hospital, developmental center, or other facility . . . for that period of time. Within 150 days of an admission made pursuant to subdivision (a) or if the defendant becomes mentally competent, the executive director or designee of the hospital or developmental center or person in charge of the facility . . . shall report to the court and the regional center director or his or her designee regarding the defendant's progress toward becoming mentally competent. . . . If the report indicates that there is no substantial likelihood that the defendant has become mentally competent, the committing court shall order the defendant to be returned to the court for [commitment or detention] proceedings pursuant to paragraph (2) of subdivision (c)."[14]

---

**14** Paragraph (2) of subdivision (c) of the statute provides in pertinent part: "In the event of dismissal of the criminal charges before the defendant becomes mentally competent, the defendant shall be subject to the applicable provisions of the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code), or to commitment and detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code." (Subd. (c)(2).)

26

The maximum commitment under section 1370.1 is three years. (Subd. (c)(1)(A) ["At the end of three years from the date of commitment or a period of commitment equal to the maximum term of imprisonment provided by law for the most serious offense charged in the information, indictment, or misdemeanor complaint, whichever is shorter, a defendant who has not become mentally competent shall be returned to the committing court"].)

### 2. *Application to Petitioner's Commitment in This Case*

Although the court in *Davis* referred to commitment to a "state hospital," the same due process concerns apply when someone is being held in confinement prior to transportation to such hospital or other facility. (See *Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1545 ["Because commitment and treatment are the intertwined rationales for suspending criminal proceedings against a mentally incompetent defendant [citation], it follows that where there is no commitment and no treatment, the time an incompetent defendant spends in jail is unnecessary and implicates not only due process, but also counts towards a finding of prolonged incarceration under the state constitutional speedy trial guarantee"].)

Due process requires that the nature and duration of commitment "bear some reasonable relation to the purpose for which the individual is committed." (*Jackson, supra*, 406 U.S. at p. 738.) In this case, once the court found Williams incompetent in August 2011, he was committed to the county jail solely for (1) the SCLARC to evaluate Williams and make the statutorily-required placement recommendation, (2) the trial to issue a placement order after receipt of the SCLARC recommendation, and (3) the sheriff to transport Williams to the facility in question.

While there may be no firm deadline for these things to occur, based on the record in this case, the two years that passed between the time the trial court found Williams incompetent and the time it ordered him placed in the county jail for treatment is unreasonable.

27

After the trial court found Williams incompetent to stand trial and ordered the SCLARC to make a placement recommendation in August 2011, it was not until November 2012 that the SCLARC actually fulfilled its duty and sent a letter to Williams' counsel advising that Williams had been assessed and determined to be eligible for regional center services. We can discern that Williams' health problems may have been responsible for some of the delay. In addition, problems retrieving Williams' medical records – which required considerable intervention by the trial court – may have contributed to the delay. Still, considering that Williams had been examined by at least two experts before the court found him incompetent due to developmental disability , it is hard to understand why it took so long for the SCLARC to reach its conclusion that Williams was eligible for services.

It took another two months before the SCLARC recommended to the court in January 2013 that Williams be placed in Porterville, a recommendation the trial court acted on within one day. It then took another four months before Porterville issued its letter stating that Williams could not be safely served there, a letter that took the court, the parties and the SCLARC by surprise because they all assumed Williams was on Porterville's waiting list, waiting only for a bed to become available.

It was incumbent on the regional center to make a placement recommendation and on the DDS to accommodate, rather than hinder, placement efforts. Due process does not permit someone declared incompetent to be confined for such a long period of time without receiving any treatment, much less without a determination that there is a substantial likelihood the person will attain competency in the foreseeable future.

**C.** **The Trial Court Correctly Determined That, Under Welfare and Institutions Code Section 6510.5, it Had No Authority to Order Williams Placed in Porterville. However, the Trial Court Still Has Options Available to Ensure that the DDS is Fulfilling its Statutory Obligations**

Williams argues the trial court should have ordered him placed at Porterville, notwithstanding that institution's refusal to accept him. The District Attorney concurs. We are not persuaded.

In concluding it had no authority to do so, the trial court cited Welfare and Institutions Code section 6510.5. That statute provides: "*Under no circumstances* shall the court order placement of a person described in this article or a dangerous person committed pursuant to Section 1370.1 of the Penal Code to a developmental center if the department [DDS] has specifically notified the court in writing that the individual cannot be safely served in that developmental center." (Italics added.)

The statute in question, which was enacted and went into effect in June 2012, has not been cited in a single case. The District Attorney impliedly acknowledges the unambiguous language in Welfare and Institutions Code section 6510.5. It notes, however, that under section 6501 of that code, Porterville "is, in essence, a haven of last resort for those inmates who need to be securely restored to competency."[15] The District Attorney then argues that construing Welfare and Institutions Code section 6510.5 as giving Porterville the "unfettered discretion to decide who it chooses to treat completely eviscerates the stated intention of the Legislature . . . that developmentally disabled persons charged with violent felonies be treated at Porterville." In other words, the

---

[15] Welfare and Institutions Code section 6501 provides: "If a person is charged with a violent felony, as described in Section 667.5 of the Penal Code, and the individual has been committed to the State Department of Developmental Services pursuant to Section 1370.1 of the Penal Code or [Welfare and Institutions Code] Section 6500 for placement in a secure treatment facility, as described in subdivision (e) of Section 1370.1 of the Penal Code, the department shall give priority to placing the individual at Porterville Developmental Center prior to placing the individual at any other secure treatment facility."

District Attorney urges this court to read a "Porterville exception" into Welfare and Institutions Code section 6510.5.

However, the statutory language is clear. "Under no circumstances" means under no circumstances. It does not mean "under some circumstances." And while the Legislature determined that preferential consideration should be given to Porterville when deciding where to place persons such as Williams, it did not *mandate* placement at Porterville. Neither did it indicate Porterville was the sole placements for such defendants. Moreover, construing Welfare and Institutions Code section 6510.5 according to its plain meaning may require difficult choices, but it does not necessarily lead to absurd consequences. DDS is obligated to find a facility that is qualified for placement. In addition, section 1370.1 provides for alternative (i.e., civil) commitment procedures if the defendant cannot attain competency.[16]

---

[16] See subd. (a)(5)(A) ["In the event of dismissal of the criminal charges before the defendant recovers competence, the person shall be subject to the applicable provisions of the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code) or to commitment or detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code"]; subd. (c)(2) ["In the event of dismissal of the criminal charges before the defendant becomes mentally competent, the defendant shall be subject to the applicable provisions of the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code), or to commitment and detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code. If it is found that the person is not subject to commitment or detention pursuant to the applicable provision of the Lanterman-Petris-Short Act (Part 1 (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code) or to commitment or detention pursuant to a petition filed pursuant to Section 6502 of the Welfare and Institutions Code, the individual shall not be subject to further confinement pursuant to this article and the criminal action remains subject to dismissal pursuant to Section 1385. The court shall notify the regional center director and the executive director of the developmental center of any dismissal"].)

Thus, while the trial court was right to question the basis for Porterville's determination that Williams could not be "safely served" at Porterville, it correctly determined that it had no authority to place Williams at Porterville.[17]

This does not mean the trial court has no tools at its disposal to ensure that the DDS is performing its statutory duties. First, the court can confirm that the DDS stands by the rejection letter. Welfare and Institutions Code section 6510.5 requires the written notice that an incompetent person cannot be safely served at a particular development center to be from "the department" (the DDS). The written notice in this case was given by way of the rejection letter, which was signed by the "Acting Community Liaison Representative" of "Porterville Regional Center." Although the DDS operates Porterville and is charged with determining who is admitted to that facility (see Welf. & Inst. Code, §§ 4440, 6501, 6509, subd. (a)(3), 7502.5, subd. (b)), the liaison representative did not expressly purport to be speaking on behalf of the DDS. Nonetheless, all parties and the trial court assumed that the rejection letter qualified as the written notice referenced in Welfare and Institutions Code section 6510.5. Because this assumption was not questioned in the trial court or in this writ proceeding, we have no occasion to consider its validity. However, nothing in this opinion should be construed as restricting the trial court's authority, after the matter is remanded to it, to take all steps it deems appropriate to confirm that the liaison representative's letter represents the official position of the DDS. This may include requiring the DDS's director to confirm that Williams cannot be safely served at Porterville, notwithstanding his extensive physical limitations and the

_____

[17] At oral argument, counsel for Williams and the SCLARC suggested Welfare and Institutions Code section 6510.5 is unconstitutional. However, such a contention was not raised in the trial court or in the briefing before this court. Accordingly, we decline to address the issue at this time. However, although we express no opinion on the question, nothing in this opinion should be construed as restricting the ability of any party to advance this argument in the trial court.

At some point, the Legislature may wish to consider whether Welfare and Institutions Code section 6510.5 should be amended to ensure that it is not invoked for reasons unrelated to safety.

Legislature's designation of Porterville as the preferred placement for someone accused of a violent felony.

Second, the trial court may issue an order to show cause and ultimately compel the DDS to fulfill its statutory obligations by offering a placement option. Welfare and Institutions Code section 4501 provides in pertinent part: "The State of California accepts a responsibility for persons with developmental disabilities and *an obligation* to them which it *must* discharge." (Italics added.) The DDS is the entity charged with fulfilling this obligation. (See Welf. & Inst. Code, § 4416 ["Unless otherwise indicated in this code, the State Department of Developmental Services has jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons, as provided in this code"].) In addition, as noted above, the DDS is required to ensure that the regional centers meet their statutory, regulatory, and contractual obligations. (Welf. & Inst. Code, §§ 4501; see also Welf. & Inst. Code, § 4434.) By vetoing the trial court's placement order – which order was made pursuant to the statutorily-required regional center recommendation – without offering any alternatives, the DDS is making it impossible for the SCLARC to fulfill its obligations. While Welfare and Institutions Code section 6510.5 may authorize the DDS to veto a *specific* developmental center placement, it does not give the DDS the authority to refuse to approve *any* placement. In short, the DDS cannot escape its responsibilities and place the burden on the trial court to come up with a placement solution for a problem the DDS has itself created. If, as discussed below, the trial court in this case is forced to release this defendant – charged with registerable sex offenses and previously convicted of registerable sex offenses – because the DDS has not provided a placement option, the responsibility for such action will lie with the DDS, not with the court.

D.      **Petitioner Must be Lawfully Committed or Released**

This brings us to the question of the remedy. Williams does not necessarily pray for an order directing that he be released outright. In his petition, he maintains that he "is entitled to immediate release from such unlawful custody [in county jail], whether to be placed in lawful custody for treatment, or released (for outpatient treatment or

otherwise).'" There is therefore no basis for ordering his immediate release. (See also *In re Davis, supra*, 8 Cal.3d at p. 806 [because "the record in the cases before us furnishes no basis for concluding that petitioners are not likely to respond to treatment . . . , it would be premature for us to order petitioners released from confinement at this time"].)

To afford the trial court an opportunity to find a lawful placement, while ensuring that Williams' current detention in the county jail is not prolonged unnecessarily, we direct the trial court to issue an order, within 45 days of finality of this opinion, placing Williams in a facility that meets the requirements of subdivision (a)(1)(B), and to ensure that such placement occurs forthwith.[18] If such an order issues, within 120 days of finality of this opinion, the trial court is to order that Williams be released or be subject to the alternative commitment procedures referenced in section 1370.1, unless the trial court determines there is a substantial likelihood that Williams will attain competency in the foreseeable future. (See subd. (b)(1); *In re Davis, supra*, 8 Cal.3d at pp. 806-807.)

Alternatively, if the trial court does not issue a new placement order within 45 days and ensure placement in accordance with such order forthwith, the trial court is directed to order that Williams be released or be subject to the alternative commitment procedures referenced in section 1370.1.[19]

---

[18] During this time, the trial court may conduct any proceedings and take any action it deems necessary to put itself in a position to make the requisite placement order, including making use of some of the tools available to it as discussed above. (See *ante*, at pp. 31-32.)

[19] We recognize that Williams may be approaching the three-year maximum commitment period. (See subd. (c)(1).) Because the issue is not before us, and because the parties may not be in agreement concerning the calculation of the three-year period in this case, we have not considered the three-year commitment period in our discussion of the remedy. We wish to emphasize, however, that nothing in this opinion should be construed as authorizing a commitment in excess of the statutory maximum three-year period.

Before concluding, we wish to add that, based on the comments of virtually all counsel at oral argument, this case reflects a statewide problem in finding adequate housing for persons declared mentally incompetent to stand trial, especially those who are developmentally disabled.  We urge the legislative and executive branches to work towards finding a solution to this problem to ensure that persons found mentally incompetent are provided the treatment they require and are not released onto the streets where they may pose a significant risk to themselves and to public safety.

## DISPOSITION

The petition is granted.  The trial court is directed (1) within 45 days of finality of this opinion, to order petitioner placed in a facility that meets the requirements of Penal Code section 1370.1, subdivision (a)(1)(B), and to ensure that such placement occurs forthwith, and (2) within 120 days of finality of this opinion, order that petitioner be released or subject to alternative commitment procedures, unless the trial court determines there is a substantial likelihood petitioner will attain competency in the foreseeable future.  If the trial court does not issue a new placement order within 45 days of finality of this opinion, the trial court is directed to order that Williams be released or be subject to the alternative commitment procedures referenced in Penal Code section 1370.1.

**CERTIFIED FOR PUBLICATION**

BIGELOW, P. J.

We concur:

FLIER, J.

GRIMES, J.

34