Filed 12/19/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

<table>
<tr><td>In re WALTER CHUNN III,<br><br>on Habeas Corpus.</td><td>A162583<br><br>(Solano County<br>Super. Ct. No. FCR319528)</td></tr>
</table>

For many years, the Department of State Hospitals (DSH) has faced a seemingly intractable problem of timely admitting criminal defendants and other patients to its facilities once ordered to do so by our state courts. Among those the DSH serves are defendants found incompetent to stand trial (IST). Although the numbers have fluctuated, it is undisputed that there has been a massive increase in referrals to the state hospital system over the past decade and the capacity of the system to admit patients has failed to keep pace. As the record in this case reflects, that failing has had very real impacts on the IST defendants for whom the DSH is obligated to provide services.

In this proceeding, Walter Chunn III was found incompetent to stand trial under Penal Code[1] section 1368. After being ordered admitted to the Napa State Hospital, he waited 75 days before he was admitted. Chunn

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

sought a petition for writ of habeas corpus, complaining that DSH's failure to promptly commence competency assessment and treatment violated his state and federal due process rights. Around the same time, defendants Pablo D. Stallings and Alan Wakefield, Jr., who were also found incompetent to stand trial, sought sanctions pursuant to Code of Civil Procedure section 177.5 against DSH for its failure to admit or otherwise undertake timely treatment to restore them to competency. The trial court heard all three cases together.

After multiple evidentiary hearings and rounds of briefing, the trial court issued a countywide standing order finding that the DSH was not adequately meeting its primary responsibility for the assessment and treatment of IST defendants. The court concluded that notwithstanding DSH's claimed inability to provide comprehensive competency restoration services due to the lack of bed space in its hospitals, DSH had at its disposal a number of processes that would allow it to undertake assessment and treatment services to stabilize and manage client symptoms while IST defendants await placement. Finding the "plain meaning of the statutes at issue and the constitutional rights of the defendants" entitled them to relief, the court set forth a lengthy and detailed order, outlining steps DSH was ordered to implement within specific timeframes to meet their obligations to provide treatment and competency restoration services to all IST defendants in Solano County. DSH timely appealed from that order.

In the meantime, almost four months after the trial court in this case issued its standing order, Division Two of this court issued its opinion in *Stiavetti v. Clendenin* (2021) 65 Cal.App.5th 691 (*Stiavetti*). The *Stiavetti* court concluded that the DSH had systematically violated the due process rights of all IST defendants in California by failing to commence substantive competency restoration services in a timely manner. Specifically, the

2

*Stiavetti* court held that a statewide deadline of 28 days is the maximum constitutional limit for commencement of substantive services to restore IST defendants to competency. (*Id.* at pp. 694–695, 730, 737–738.)

On appeal in this case, DSH argues that the trial court's standing order is flawed in numerous respects. DSH argues the order (1) violates separation of powers principles, (2) conflicts with *Stiavetti*'s statewide deadline for the provision of substantive services to restore competency and its holding regarding the point at which DSH becomes legally responsible for IST defendants, (3) improperly blames DSH for failings of county officials who have responsibility for conditions at the jail, and (4) erroneously permits the imposition of monetary sanctions in the amount of $1,500 per day for noncompliance with its order.

To add a further layer of complexity, since DSH appealed, the Legislature has twice amended statutes governing the process for admission of IST defendants and the responsibilities of DSH. We asked the parties for supplemental briefing about the effect of some of the recent changes to the law and whether this court should remand the matter to the trial court for reconsideration of its order in light of the *Stiavetti* decision and subsequent statutory changes.

For reasons we will explain, we conclude the trial court's thoughtful and considered ruling did not violate separation of powers principles at the time it was made, nor, for the most part, does it conflict with *Stiavetti*. We disagree that the trial court's weighing of the evidence and balancing of competing interests in this case reflected an abuse of discretion or that the court's imposition of deadlines consistent with statutory law, constitutional precedent, and legislative intent as reflected in then-existing law violated the separation of powers doctrine. We appreciate the complex and difficult

3

problems created by limited funding, resources, and bed space to treat IST defendants at DSH facilities, and the many efforts by DSH, also acknowledged by the trial court in this proceeding, to address them. We also, however, agree with the trial court here and our many sister courts, that such challenges do not relieve DSH of its responsibility to provide treatment and competency restoration services within a reasonable period of time.

Nonetheless, due to changes in the law, we conclude some aspects of the order must be modified and others may be reconsidered.  Accordingly, as we elucidate below, we will remand for the trial court to reconsider its order in light of *Stiavetti* and relevant statutory amendments.

## I.  BACKGROUND

### A.  IST Statutory Scheme

A mentally incompetent defendant is one who, "as a result of a mental health disorder or developmental disability, . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (§ 1367, subd. (a).)  A defendant may not be tried or sentenced while mentally incompetent.  (*Ibid.* ["A person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent."]; see *People v. Rodas* (2018) 6 Cal.5th 219, 230 [due process precludes trial or conviction of mentally incompetent defendant].)  When "a doubt arises in the mind of the judge" and defense counsel agrees that the defendant is or may be mentally incompetent, criminal proceedings must be suspended until the question of the defendant's competence has been determined.  (§ 1368, subds. (a)–(c); *Rodas*, at p. 231.)  If a court finds that a defendant is IST, the court shall order the defendant be delivered to a DSH facility or any other public or private treatment facility "that will promote the

4

defendant's speedy restoration to mental competence."[2]  (§ 1370, subd. (a)(1)(B)(i).)

Prior to making the commitment order, the court must order the community program director or a designee to evaluate the defendant and make a written recommendation as to the appropriate placement for the defendant.  (§ 1370, subd. (a)(2)(A)(i).)  The court must also hear and determine whether the defendant lacks capacity to make decisions regarding the administration of antipsychotic medication, and under certain statutory conditions, make appropriate orders regarding the administration of antipsychotic medication as needed, including on an involuntary basis. (§§ 1370, subd. (a)(2)(B), 1369.)

Once a court orders an IST defendant's commitment, it must provide copies of documents specified by statute to the DSH or other treatment facility, prior to the IST defendant's admission.  (§ 1370, subd. (a)(3).)  Within 90 days of the court's commitment order, the medical director of the DSH or other treatment facility "shall make a written report . . . concerning the defendant's progress toward recovery of mental competence and whether the administration of antipsychotic medication remains necessary."  (§ 1370, subd. (b)(1); *Jackson v. Superior Court* (2017) 4 Cal.5th 96, 101.)  If the 90-day report indicates that the defendant has been restored to competency or is unlikely to regain mental competence in the foreseeable future, the defendant must be returned to the court no later than 10 days after receipt of the report. (§§ 1370, subd. (b)(1)(A), 1372, subd. (a)(3)(C).)  Defendants may not be confined as an IST for more than two years, or longer than the maximum

---

[2] Alternatively, the court may order an IST defendant placed on outpatient status.  (§ 1370, subd. (a)(1)(B)(i).)

5

sentence for the most serious offense charged, whichever is shorter. (§ 1370, subd. (c)(1).)

In 2021, not long after the *Stiavetti* opinion issued, the Legislature enacted an omnibus health trailer bill, Assembly Bill No. 133 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 143.) (Assembly Bill 133). Effective July 27, 2021, the new legislation amended section 1370 to allow DSH to conduct evaluations of IST defendants in county custody, pursuant to newly added Welfare and Institutions Code section 4335.2, to determine whether a defendant has (1) regained competence, (2) is unlikely to regain competence in the foreseeable future, or (3) should be referred for a county diversion program or an outpatient program. (§ 1370, subd. (a)(1)(H)(i), as amended by Stats. 2021, ch. 143, § 343.) Assembly Bill 133 also added section 4335.2 to the Welfare and Institutions Code, which established a program for DSH to perform "reevaluations" of IST defendants, primarily through telehealth evaluations.[3] As originally enacted, section 4335.2 provided that such evaluations were intended for IST defendants "who have been waiting for admission to [DSH] 60 days or more from the date of the commitment." (Stats. 2021, ch. 143, § 351.) The statute expressly stated that "[b]eginning July 1, 2021, the department, or its designee, shall have the authority and sole discretion to consider and conduct reevaluations for IST defendants

_____

[3] Assembly Bill 133 also added section 4147 to the Welfare and Institutions Code, which provided for an "Incompetent to Stand Trial Solutions Workgroup" comprised of members of relevant state agencies, the Judicial Council, local government and justice system partners, and representatives of patients and their family members as needed to "confront the crisis of individuals found incompetent to stand trial (IST) and in recognition of the importance of these defendants who are committed to the State Department of State Hospitals to begin receiving competency treatment as soon as practicable . . . ." (Stats. 2021, ch. 143, § 350.)

6

committed to and awaiting admission to the department for 60 days or more."
(*Ibid.*)  It further stated:  "At the sole discretion of the department, the department clinician or contracted clinician may conduct in person, or video telehealth, evaluations of IST defendants at the local jail for those IST patients awaiting admission more than 60 days since their commitment to the department."  (*Ibid.*)

In 2022, the Legislature passed Senate Bill No. 184 (2021–2022 Reg. Sess.) (Senate Bill 184), which amended Welfare and Institutions Code section 4335.2 to eliminate the requirement that the program only serve defendants who have been waiting 60 days or more for admission.[4]  (Welf. & Inst. Code, § 4335.2, subd. (b), as amended by Stats. 2022, ch. 47, § 53.)  As noted above, we asked the parties to file supplemental briefs addressing the impact of the changes in legislation on the validity of the trial court's order in this matter, and whether remand for reconsideration of its order in light of *Stiavetti* and recent statutory changes would be appropriate.

## B.  *Factual and Procedural Background*

In February 2016, Chunn filed a petition for writ of habeas corpus in propria persona, asserting that he was competent to stand trial and that his constitutional rights had been violated because Napa State Hospital failed to admit and evaluate him, depriving him of a reasonable means of contesting his commitment.  The trial court ordered DSH to show cause why the court should not impose an injunction requiring DSH to admit IST defendants in Solano County for evaluation and treatment within a set period of time.[5]

---

[4] The legislation was effective June 30, 2022, the day before the reply brief in this matter was filed.

[5] Although Chunn was admitted to Napa State Hospital the day before he filed his petition for writ of habeas corpus, the trial court elected to continue the proceeding because it raised an "important public concern that

7

DSH filed a return, and Chunn, represented by appointed counsel filed a traverse, requesting an evidentiary hearing. The trial court granted his request for an evidentiary hearing.

Meanwhile, two other Solano County IST defendants, Pablo D. Stallings and Alan Wakefield, Jr., sought sanctions against DSH for failing to timely admit them for competency restoration treatment. The trial court informally joined Chunn's habeas proceeding with the Stallings and Wakefield matters because the three cases involved similar factual and legal issues.[6]

The parties submitted multiple declarations, witness lists, requests for judicial notice, and supplemental briefing addressing specific questions outlined by the trial court in a detailed written order. In February 2019, the evidentiary hearing commenced.[7] The hearing took place on February 4, 5, and May 23, 2019. The parties submitted additional declarations and briefing after the hearing. The parties gave closing arguments in October 2020, and submitted further supplemental briefing and declarations after closing arguments.

On February 26, 2021, the trial court issued an amended 35-page standing order concluding that defendants had established their entitlement to meaningful relief. The court began by summarizing the factual backgrounds of Chunn, Stallings, and Wakefield, describing the delay in

_____

touches on the rights of a class of individuals and is likely to recur in the future."

[6] Stallings and Wakefield are not parties to this appeal.

[7] As the trial court explained in its final order, the court "with the assent of the parties, slowed these proceedings to afford DSH the opportunity to pursue remedial measures and meaningfully address" the waitlist for admission to DSH without judicial intervention.

8

evaluation and treatment services after their respective orders of commitment and the substantial evidence of decompensation each experienced during the time they were awaiting placement. Discussing the role of the DSH in treating IST defendants, the trial court reviewed statistics reflecting a substantial increase in admissions over the past decade and an expanding waitlist which continued to grow despite DSH's efforts to both expand its capacity and reduce its demand by, among other things, constructing new facilities, establishing jail-based competency treatment (JBCT) programs in a number of county jails, and drafting mental health diversion legislation, which was successfully adopted. During this time, courts throughout California had made a range of orders seeking to remediate delays by issuing county-specific standing orders requiring DSH to place defendants within a certain period of time or imposing sanctions to compel prompt placement. The trial court also noted that DSH had been engaged in litigation for many years regarding its failure to provide adequate psychiatric services to mentally ill persons being held in state prisons.

The trial court's order next summarized the evidence presented with respect to the lack of treatment for Solano County IST defendants in particular. Documents submitted by DSH Chief of Research, Evaluation, and Data Janna Lowder-Blanco showed that between 2015 and early 2020, Solano County IST defendants experienced average placement delays between 55 and 93 days to either a state hospital or JBCT program. The court noted that the parties had "offered substantial evidence that IST defendants receive little if any ameliorative care in Solano County pending IST placement."

In particular, the trial court noted Deputy Sergeant Rondo Sands of the Solano County Sheriff's Department, who served as the liaison between the

court and the DSH, testified regarding the circumstances of untreated IST defendants "languishing in his jail." Sands described "a wide range of troubling behavior and IST defendant suffering, noting that they routinely engage in self-injurious behavior, feces smearing, and other shocking behaviors, and that they pose a significant risk of harm to staff and other inmates." DSH, on the other hand, offered evidence of limitations in caring for IST defendants in Solano County which, it contended, exacerbated existing waitlist problems. Specifically, the court noted that DSH presented evidence that (1) local jail and mental health agencies undertake no meaningful effort to seek involuntary psychotropic medication orders for persons in distress, allowing defendants to decompensate without treatment; (2) there is no continuity of care for persons traveling in and out of jail, resulting in increased mental illness symptoms and reduced amenability to treatment; (3) the county offers no outpatient competency restoration services or alternatives for IST defendants; and (4) even after DSH developed funding for local mental health diversion programs, Solano County failed to submit a funding plan to the state, resulting in the loss of millions of dollars that might have helped reduce the IST backlog.

IST defendants in Solano County, the trial court explained, "are usually held in solitary cells or restricted conditions for at least 6 weeks after the initial declaration of doubt regarding their competency as the court awaits alienist evaluations and placement recommendations. These defendants have often clinically deteriorated even before the DSH commitment order is made and quite often (as occurred in all 3 cases at issue here) their troubling symptoms have increased during the period of time after the commitment order and before DSH offers them a bed. The situation is dire for these patients as they routinely face another 60–90 days without

10

treatment after the DSH commitment is made until treatment commences." The court wrote, "The IST defendants in this case have established that they and other similarly-situated IST defendants have suffered and are suffering devastating injury as they are warehoused without meaningful treatment as they await DSH intervention," noting "[t]his calamity presents specific challenges not necessarily present in other jurisdictions where local facilities provide at least some ameliorative care." (Fn. omitted.)

In its legal analysis, the trial court examined at length the federal and state case law addressing the constitutional and statutory rights of IST defendants to compel assessment and treatment, the evidence of harm presented by Chunn, Stallings, and Wakefield, and the meaning of "commitment" in section 1370 as it relates to DSH's responsibility to undertake its duties to assess and treat IST defendants promptly.

Further, the court looked to timelines in section 1370 and other statutory schemes, including the criminal code and the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.), to discern legislative goals with respect to the prompt assessment and treatment of mentally ill persons, noting it was "difficult to reconcile DSH's position that a 60-day delay in *commencement* of treatment of persons in jail is legislatively-authorized when the existing mental health system for seriously-mentally ill persons not in jail contemplates *completion* of the evaluative and stabilization process within 48 days." The court then pointed to the United States Supreme Court's opinion in *Jackson v. Indiana* (1972) 406 U.S. 715, 738, which held that an IST defendant cannot be held "more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future" and that "even if it is determined that the defendant probably soon will be able to stand trial, his continued

11

commitment must be justified by progress toward that goal." The trial court explained there was "nothing in the factual record of this cases [*sic*] that establishes that, during these lengthy delays, these IST defendants are making progress towards a determination of their competency or towards the restoration thereof."

In its discussion of the legal issues presented, the trial court highlighted "a separate question that recent litigation has not addressed: *Assuming delays in placement following a commitment order to DSH*, *is DSH responsible for patient care pending placement?*" Drawing on evidence in the record that "DSH has a range of tools at its disposal to increase its treatment capacity," including "jail-based treatment and telecare," the trial court concluded that DSH had demonstrated its ability to provide psychiatric assessment and treatment services "notwithstanding the alleged unavailability of bed space." The court noted the provision of ameliorative care pending placement of IST defendants would serve several important legislative goals of section 1368, by (1) identifying section 1368 outliers (either malingerers or individuals unlikely to be restored to competency) who could promptly be redirected from the IST waitlist; (2) ensuring that the continued commitment of IST defendants is justified by progress toward restoration of competency; and (3) most importantly, treating symptoms and easing the suffering of IST defendants.

At the conclusion of its order, the trial court summarized its findings and issued a detailed, county-wide standing order. Specifically, the court found that (1) DSH had failed to provide IST defendants in Solano County prompt treatment or assessment services after their commitment for competency restoration services; (2) defendants were suffering from "extreme, severe, debilitating mental and physical conditions, to such a degree that it

12

violates our concepts of dignity, civilized standards, humanity and decency"; (3) defendants were not being afforded adequate local treatment for their conditions; (4) DSH justifications for their failure to promptly afford treatment services did not negate their obligation to do so and the plain meaning of the statutes at issue and the constitutional rights of defendants supported their right to relief; (5) notwithstanding DSH's failure to promptly place IST defendants, DSH had a "separate responsibility to provide prompt psychiatric and medical assistance to these suffering mentally ill persons until such time as full competency restoration treatment can commence"; and (6) the "more detailed and formal structure of a general order" would enhance the court's capacity to protect defendants' rights, while alleviating their suffering and creating a compliance structure for the imposition of "meaningful and effective sanctions" should the orders fail to result in improved responses.

Accordingly, the court ordered as follows:

"1.     For purposes of this order, each Solano County IST defendant shall be deemed committed to the care of DSH upon receipt by DSH of the court's commitment order.

"2.     Upon receipt of that commitment order, if defendant cannot be placed in a designated state hospital facility within 72 hours, DSH shall commence meaningful engagement with the defendant and psychiatric treatment prior to the expiration of those 72 hours.  At a minimum that DSH shall evaluate defendant's condition and determine whether defendant is suffering from significant cognitive, emotional and/or physical symptoms of his mental illness which will continue or be exacerbated if placement does not immediately occur.  If such symptoms are present, DSH shall undertake prompt and meaningful efforts to treat defendant's symptoms.

13

"3.     If defendant is in need of psychotropic medication or other medical interventions, DSH shall pursue such interventions either voluntarily, though [*sic*] meaningful engagement efforts with defendant in a clinically-appropriate manner, or by initiating proceedings to seek authorization for the involuntary administration of such medications.

"4.     If DSH fails or declines to assess and undertake meaningful treatment to address defendant's immediate psychiatric needs and attempt to alleviate defendant's severe symptoms within 72 hours, then placement in a DSH facility must occur within 7 days of the commitment order.

"5.     If DSH does not place defendant within 7 days, it shall, within seven days of placement order, determine when defendant is likely to be placed in a state hospital, JBCT program, or other competency restoration program and shall notify the court and counsel of the anticipated placement date.  If placement is not anticipated to occur within 28 days of commitment order, DSH shall develop a written remediation treatment plan to actively treat defendant's significant symptoms pending commencement of full IST placement.  DSH shall provide a copy of that written plan to the court and counsel.

"6.     The treatment detailed in that remediation plan shall continue unabated, as medically appropriate, throughout the course of defendant's continued placement in jail awaiting entry into a DSH facility or program.

"7.     If DSH has failed to place defendant in a state hospital, JBCT program, or other program within 28 days of the court's commitment order, DSH shall provide to the court a weekly written report describing its efforts to remediate the symptoms of defendant, the treatment plan, the nature and extent of defendant's ongoing symptoms, and an estimate of date of projected

14

admission. That report shall also address DSH capacity to complete the competency evaluation within 90 days of the placement order.

"8. The Court finds and orders that the 90 day evaluative report mandated by Penal Code section 1370[, subdivision] (b)(1) shall be due 90 days from its commitment order. For all the reasons discussed in this ruling, the Court rejects the DSH assertion that the clock for this requirement does not start running until defendant has been placed in one of its facilities.

"9. Nothing in this order shall preclude DSH from relying on local treatment providers or contractors to assist it in complying with the terms of this order. DSH may contract with, seek to compel, or otherwise pursue all available avenues to induce local agencies to assist it in complying with these orders and provide prompt, meaningful psychiatric assistance to these defendants.

"10. The Court finds that each day of delay in placement or commencement of treatment poses a substantial risk of significant harm and injury for each IST defendant. Accordingly, for purposes of both recognizing the gravity of this suffering and encouraging prompt DSH compliance with this order, the Court shall deem each 24-hour period of non-compliance a new, separate and distinct violation of its orders for purposes of imposing potential sanctions under [Code of Civil Procedure] section 177.5. The trial court managing each case, may, in its discretion, schedule daily contempt hearings during the period of delays in commitment at which time the court may seek to impose daily sanctions, presumably in an amount equal to the costs of actually providing these defendants treatment each day, but in no circumstances more than $1500 per day or event."

The court stayed implementation of the standing order to September 1, 2021, to allow DSH time to fully develop its ability to comply with the

standing order.  The court also observed that the imposition of sanctions against DSH in the Stallings and Wakefield matters would not be productive "in light of the significant passage of time since commencement of these proceedings," but offered appreciation to both defendants for their "participation and willingness to allow their individualized circumstances to demonstrate the systematic problems with our competency restoration processes."  DSH timely appealed.

## II.  DISCUSSION

### A.  *Standard of Review*

The trial court's standing order in this case was a permanent injunction.  On appeal, we review the decision to grant injunctive relief for abuse of discretion.  (*In re Loveton* (2016) 244 Cal.App.4th 1025, 1042–1043 (*Loveton*); *Stiavetti, supra*, 65 Cal.App.5th at p. 705.)  As our Supreme Court has explained, that standard "is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.)  We review a trial court's factual findings for substantial evidence and its conclusions of law de novo.  Its application of the law to the facts is reversible only if it is arbitrary and capricious.  (*Id.* at pp. 711–712.)  On appeal of a countywide standing order granting injunctive relief to IST defendants, we review for an abuse of discretion "the trial court's weighing of the evidence presented and its balancing of the competing interests involved in determining the necessity for and scope of equitable relief." (*Stiavetti*, at p. 706.)

### B.  *Due Process Rights of IST Defendants*

Before turning to the merits of the parties' arguments, we will briefly review relevant legal authority regarding the constitutional rights of IST

16

defendants.[8]  Under both the federal and California Constitutions, IST defendants have constitutional due process liberty interests.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)  IST defendants "cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he [or she] will attain that capacity in the foreseeable future.  If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.  Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his [or her] continued commitment must be justified by progress toward that goal." (*Jackson v. Indiana, supra*, 406 U.S. at p. 738, fn. omitted; *In re Davis* (1973) 8 Cal.3d 798, 801; *Jackson v. Superior Court, supra*, 4 Cal.5th at p. 100.)

For more than a decade now, California courts have wrestled with the problem of timely hospital admissions for IST defendants once they have been ordered committed because the number of IST defendants has outstripped space available for treatment in DSH facilities.[9]  (*People v.*

---

[8] Other courts have thoroughly examined the development of our law on this subject.  (See, e.g., *Stiavetti, supra*, 65 Cal.App.5th at pp. 706–711; *Loveton, supra*, 244 Cal.App.4th at pp. 1036–1042; *People v. Brewer* (2015) 235 Cal.App.4th 122, 130–132.)

[9] Federal courts have also addressed the issue of what constitutes a reasonable period of time to await restoration of competency treatment in light of federal due process requirements.  (See *Oregon Advocacy Center v. Mink* (9th Cir. 2003) 322 F.3d 1101, 1122–1123 [upholding injunction imposing seven-day deadline for admission of mentally incapacitated criminal defendants to Oregon State Hospital]; *Trueblood v. Wa. Dept. of Social & Health Servs.* (W.D.Wn. 2015 ) 101 F.Supp.3d 1010, 1022–1024 (*Trueblood I*) [imposing seven-day deadline for admission to hospital for competency restoration services for IST defendants in Washington], reversed in part on another ground in *Trueblood v. Wash. Dept. of Social & Health*

*Kareem A.* (2020) 46 Cal.App.5th 58, 66–67 (*Kareem A.*).) IST defendants subjected to lengthy wait times have sought and obtained relief in various forms, resulting in a patchwork of decisional law governing the reasonable admission deadlines to treatment facilities and consequences for failure to meet them. (See *In re Mille* (2010) 182 Cal.App.4th 635, 649–650 [84-day wait for admission to state hospital was not reasonable in light of statutory requirement that DSH report on progress toward restoration of competence within 90 days]; *In re Williams* (2014) 228 Cal.App.4th 989, 1014, 1018 [two years between incompetency finding and placement order for treatment was unreasonable; developmentally disabled defendant was to be placed in treatment facility within 45 days or released]; *People v. Brewer*, *supra*, 235 Cal.App.4th at pp. 137–143 (*Brewer*) [court did not violate separation of powers or abuse its discretion in issuing amended standing order requiring transfer of Sacramento County IST defendants to DSH within 14 days of commitment order, but appellate court remanded for reconsideration of deadline in light of statutory changes]; *Loveton*, *supra*, 244 Cal.App.4th at pp. 1043–1044 [upholding 60-day limit for transfer of Contra Costa County IST defendants to DSH-Napa]; *People v. Hooper* (2019) 40 Cal.App.5th 685, 688–689 [affirming award of monetary sanctions for violation of Contra Costa County standing order requiring IST defendants be admitted within 60 days]; *Kareem A.*, at pp. 68–71, 76–77 [affirming awards of monetary sanctions against DSH for failure to admit IST defendants within 60 days or more of commitment and rejecting challenge to 30-day deadline imposed by trial court for admission of IST defendants in commitment orders]; *People v.*

---

*Servs.* (9th Cir. 2016) 822 F.3d 1037, 1046 (*Trueblood II*); *Advocacy Center v. Louisiana Dept. of Health* (E.D. La. 2010) 731 F. Supp.2d 603, 621–624, 627 [imposing 21-day deadline for admission of IST defendants in Louisiana].)

*Aguirre* (2021) 64 Cal.App.5th 652, 655–659, 670 (*Aguirre*) [affirming award of sanctions against DSH for failing to timely admit San Joaquin County IST defendants].)

Most recently, in *Stiavetti, supra*, 65 Cal.App.5th 691, Division Two of this court considered the trial court's imposition of a statewide deadline to protect IST defendants' rights to due process. The *Stiavetti* court approved a statewide deadline requiring that IST defendants begin receiving competency restoration services within 28 days from the date of service of the commitment packet, a time that reflects the "maximum constitutionally permissible delay in commencing substantive services." (*Id.* at pp. 727, 730.) We turn now to Chunn's argument that the trial court's standing order in this case violates several aspects of *Stiavetti*.

## C. Stiavetti v. Clendenin

DSH contends that the trial court's order "is facially inconsistent" with *Stiavetti* in "multiple significant respects."

As noted previously, about four months after the trial court entered its standing order in this case, Division Two of this court issued its opinion in *Stiavetti*. In that case, family members of IST defendants and two organizations filed a petition for writ of mandate and complaint for declaratory and injunctive relief against DSH and the Department of Developmental Services. (*Stiavetti, supra*, 65 Cal.App.5th at pp. 694, 703.) After extensive briefing and presentation of evidence, the trial court concluded that DSH had systematically violated the due process rights of IST defendants who are committed to DSH.[10] (*Id.* at pp. 703–704.) The trial

---

[10] We do not discuss the *Stiavetti* case as it pertains to IST defendants committed to the State Department of Developmental Services, as they are not relevant to the issues in this appeal.

court determined that due process requires DSH to commence substantive services to restore an IST defendant to competency within 28 days of the date of service of the commitment packet that the court is required to provide under section 1370, subdivision (a)(3). (*Stiavetti*, at p. 704.)

The Court of Appeal affirmed the order as to IST defendants. Following a thorough review of relevant constitutional provisions and case law regarding the rights of IST defendants, the appellate court considered the propriety of a statewide deadline to remedy the ongoing violation of IST defendants' due process rights. (*Stiavetti*, *supra*, 65 Cal.App.5th at pp. 706–714.) The court rejected DSH's argument that the "reasonable length of time for admission of IST defendants must be decided on a case-by-case basis, depending on the factual circumstances." (*Id.* at p. 713.) Rather, the court acknowledged the many efforts of California courts through individual and standing orders to resolve the problem of increasing delays in admitting IST defendants to DSH, but noted such "[a]ttempts to enforce the constitutional rights of IST defendants on a case-by-case—or even county-by-county—basis have not succeeded . . . because they do not provide the uniformity and predictability essential to effective enforcement." (*Id.* at p. 714.) "Considering the evidence of longstanding and continuing delays in admission of IST defendants, the absence thus far of legislative action on this specific issue, and the necessarily piecemeal nature of the remedies imposed by the Courts of Appeal of this state," the *Stiavetti* court concluded "the trial court reasonably determined that a uniform statewide deadline is necessary to ensure the commencement of substantive services for these defendants within a 'reasonable period of time.'" (*Ibid.*) The *Stiavetti* court also affirmed the trial court's conclusion that the "transfer of responsibility point for DSH" is the date of service of the commitment packet. (*Id.* at p. 722.)

20

Turning to the issue of the " 'maximum constitutionally permissible delay' before provision of competency services," the court rejected DSH's argument that a 28-day limit was arbitrary and improper. (*Stiavetti*, *supra*, 65 Cal.App.5th at pp. 724–727.) First, the court concluded that the trial court had appropriately balanced IST defendants' private interests in their fundamental right to liberty, the government's interests in its fiscal and administrative constraints, statutory reporting requirements, and in bringing those accused of crime to trial, and "reasonably found, after weighing the relevant interests involved, that defendants' systematic deprivation of IST defendants' 'substantive liberty interests under the Fourteenth Amendment' was a significant factor in determining the maximum constitutionally permissible delay in commencing substantive services." (*Ibid*.) Next, the appellate court observed, the trial court considered and gave particular weight to timing requirements in the statutes governing IST defendants and other relevant statutory schemes, including pretrial timelines in criminal matters generally and the procedures for involuntary treatment under the Lanterman-Petris-Short Act. (*Stiavetti*, at pp. 727–729.) Finally, the trial court reviewed and gave substantial weight to federal case law imposing statewide deadlines of between seven and 21 days from commitment to admission of IST defendants in other states. (*Id*. at p. 729.) Recognizing the trial court's "careful consideration of the extensive evidence presented about IST defendants and defendants' processes throughout California, its thorough analysis of the relevant case law and statutory schemes in light of that evidence, and its balancing of the individual liberty and governmental interests involved," the *Stiavetti* court held the trial court had "acted within its broad discretion" in finding that due process requires commencement of

21

substantive competency services for IST defendants within a maximum of 28 days of service of the commitment packet. (*Id.* at p. 730.)

### 1. *DSH Responsibility for IST Defendants*

DSH first asserts the trial court in this case erred in concluding that Solano County IST defendants "shall be deemed committed to the care of DSH upon receipt by DSH of the court's commitment order." Chunn concedes that the trial court's standing order must be modified to provide that responsibility for the treatment of IST defendants transfers to the DSH upon service of the commitment packet under section 1370, subdivision (a)(3).

We agree. *Stiavetti* held that the "transfer of responsibility point for DSH is the date of service of the commitment packet." (*Stiavetti, supra,* 65 Cal.App.5th at p. 722.) The commitment packet contains documents that provide crucial information about the defendant, including the commitment order, information about the defendant's sentence and criminal history, court-ordered psychiatric examination or evaluation reports, the community program director's recommendation for placement, and medical records. (§ 1370, subd. (a)(3).) Because the commitment order cannot be implemented until the court serves DSH with the commitment packet, DSH is not legally responsible for IST defendants until that occurs. (*Stiavetti*, at p. 721.) As the *Stiavetti* court made clear, however, the point of responsibility transfer is the "date of service of the commitment packet, not the date DSH considers a packet complete." (*Id.* at p. 722.) Accordingly, the trial court must modify its standing order to provide that each Solano County IST defendant shall be deemed committed to the care of DSH upon service by the court of the commitment packet required by section 1370, subdivision (a)(3), whether or not the packet is complete. (*Stiavetti*, at pp. 721–722.)

### 2. 28-day Deadline

DSH next argues the trial court's order requiring meaningful engagement and psychiatric treatment of a defendant within 72 hours and placement in a DSH facility within seven days if that does not occur is plainly inconsistent with *Stiavetti*'s constitutional rule. Chunn responds that the trial court's standing order is consistent with *Stiavetti*, because like the order in *Stiavetti*, the order in this case requires commencement of substantive competency restoration services within 28 days.

The trial court's standing order requires that if DSH does not place an IST defendant in one of its facilities within seven days, it shall "within seven days of placement order"[11] determine whether placement will occur within 28 days, and if not, develop and implement a written remediation treatment plan to actively treat the defendant's symptoms pending commencement of full IST placement. It also requires that after 28 days, DSH shall provide weekly written reports to the court that describe its efforts to comply with the treatment plan and include an estimate for projected admission. We agree that these aspects of the order identify 28 days as an important marker for admission to a DSH facility or treatment program, but they do not clearly state competency restoration services must begin within 28 days. Of course, the order was made before the *Stiavetti* decision, without the benefit of its guidance establishing a statewide constitutional maximum deadline of 28 days for commencement of substantive competency restoration services.

---

[11] No party discusses this phrase and it is unclear to us what "placement order" means.

23

Accordingly, we will remand for the trial court to reconsider its order and incorporate any appropriate changes in light of *Stiavetti*.[12]

As to the provision of the court's order requiring "meaningful engagement" and "psychiatric treatment" within 72 hours, we disagree the trial court's order is inconsistent with the holding of *Stiavetti.* As the *Stiavetti* court explained, that case was concerned with "the maximum constitutionally permissible delay for commencement of substantive services for IST defendants after a trial court has found them incompetent and ordered them committed to DSH," defining "substantive services" as the "receipt of substantive services to restore competency . . . with the goal of allowing criminal proceedings to resume." (*Stiavetti, supra*, 65 Cal.App.5th at p. 694; see *id.* at p. 695 [DSH systematically violated due process rights of all IST defendants in California by "failing to commence substantive services designed to return those defendants to competency"].)

The trial court's order in this case requiring engagement with IST defendants and treatment of severe symptoms within 72 hours was aimed, as the court explained, at a different problem—what to do with IST defendants to stabilize their condition and provide humane treatment prior to their transfer to a DSH facility for commencement of full competency restoration services. As noted earlier, in its discussion of the legal issues presented, the trial court's order highlighted "a separate question that recent litigation has not addressed: *Assuming delays in placement following a commitment order to DSH, is DSH responsible for patient care pending placement?*" Drawing on evidence in the record that "DSH has a range of tools at its disposal to

---

[12] We discuss further below, DSH's argument that the reporting requirement in the trial court's standing order violates separation of powers principles.

24

increase its treatment capacity," including "jail-based treatment and telecare," the trial court concluded that DSH had demonstrated its ability to provide psychiatric assessment and treatment services "notwithstanding the alleged unavailability of bed space." The court also noted the provision of *ameliorative care pending placement* of IST defendants in DSH facilities would serve important legislative goals of section 1368, including, among other things, treating symptoms and easing the suffering of IST defendants.

*Stiavetti*'s holding that 28 days is *the outer limit for a maximum delay in commencement of competency restoration services* statewide does not mean that a trial court is without authority to consider, on the record before it, whether IST defendants are in need of services to treat the most severe symptoms of their mental illness and stabilize their condition before competency restoration services begin. Here, based on ample evidence that the three defendants in this case decompensated quickly, suffered "severe harm," and "their troubling symptoms [had] increased" while awaiting admission to a hospital, the trial court ordered that DSH must evaluate and begin stabilizing treatment of significant and severe symptoms defendants might be experiencing within 72 hours. We fail to see how that order conflicts with *Stiavetti*'s maximum outer limit deadline for commencement of competency restoration services.

DSH complains that the trial court's standing order in this case "resurrects one of the problems that *Stiavetti*'s statewide deadline sought to solve—the piecemeal variation in timing from county to county." But the problem the trial court's 72-hour requirement here addressed was a different issue than that addressed in *Stiavetti*—that is, not when competency restoration services must begin, but what obligations DSH has to IST defendants for whom it is responsible before restoration services begin. We

25

acknowledge DSH's legitimate concern about the possibility that such orders imposed on a county-by-county basis could make compliance and enforcement challenging, but our review of the trial court's order is limited by the nature of that order. The trial court's decision in this case was a countywide order based on the record before it; unlike the *Stiavetti* court, we do not have before us a decision on a statewide basis.[13]

Although we conclude the trial court's order in this case does not conflict with the holding of *Stiavetti*, we also conclude, for reasons discussed further below, that the provision of the standing order requiring evaluation of IST defendants within 72 hours is problematic under recent statutory amendments.

### D. Separation of Powers

DSH argues that the trial court's standing order violates separation of powers principles because it created "a host of new obligations that have no

---

[13] Indeed, in highlighting the problem of piecemeal variation from county-to-county, DSH cites to a portion of *Stiavetti* which quotes from *Loveton, supra,* 244 Cal.App.4th at pages 1047–1048 & footnote 19, and explains, "These passages from *Loveton* make clear that we were not attempting to define an outside constitutional limit for admission to DSH for IST defendants statewide." (*Stiavetti, supra,* 65 Cal.App.4th at pp. 719–720.) The *Stiavetti* court then explains, "In this case, we are addressing a very different situation involving a statewide order that includes all California counties and all DSH facilities." (*Id.* at p. 720.) Here, as in *Loveton*, we are reviewing the propriety of the trial court's order based on a standing order for a single county. (See *Loveton*, at p. 1028.) Moreover, while we agree that a statewide solution to this issue would be preferable, we echo the observations of many courts that the legislative and executive branches are better positioned to fashion such solutions with respect to adequate treatment and competency restoration services for IST defendants. (See, e.g., *Stiavetti*, at p. 737; *Loveton*, at pp. 1047–1048, fn. 19; *Brewer, supra,* 235 Cal.App.4th at p. 154 (conc. & dis. opn. of Nicholson, J.); *In re Williams, supra,* 228 Cal.App.4th at pp. 1018–1019.)

express or implied basis in California's statutory IST commitment scheme or any other pertinent statute," and thus, the court "engaged in unilateral lawmaking." Specifically, DSH contends the trial court's order, requiring either state hospital admission of Solano County IST defendants within 72 hours of receipt of a commitment order *or* commencement of evaluation and treatment services for those defendants, exceeded the court's power and "cross[ed] the line from mere enforcement of existing duties to blatant judicial revision of the Department's statutory obligations." DSH also asserts the trial court's requirement that DSH prepare written treatment plans and weekly progress reports in cases where it is not anticipated that an IST defendant will be admitted within 28 days of the commitment order violates separation of powers by imposing reporting requirements not contemplated under the statutory scheme.

Our courts have repeatedly concluded that the setting of deadlines for the treatment and admission of IST defendants to state hospitals does not violate the separation of powers doctrine. In *Brewer*, *supra*, 235 Cal.App.4th 122, for example, the appellate court rejected DSH's argument that the trial court lacked fundamental jurisdiction to issue a countywide standing order requiring transfer of IST defendants within 14 days of the commitment order. Noting that section 1370 itself provides a deadline for transfer to a state hospital by requiring that a progress report be submitted to the court within 90 days of commitment, the *Brewer* court explained, "In setting a deadline for transfer, a court is *not* rewriting or adding to the statute. Instead, the court is enforcing the statutory imperative for a meaningful progress report within 90 days of the commitment order. The court can do this only by 'ensur[ing] that the defendant is actually transferred to the state hospital within a reasonable period of time.' [Citation.] Setting a deadline—establishing the

27

outer limit of a reasonable time—does not violate the separation of powers doctrine.  A court acts within its constitutional core function and does not violate the separation of powers doctrine when it interprets and applies existing laws and carries out the legislative purpose of statutes.  [Citation.] That is all the transfer deadline does." (*Brewer*, at p. 137; see *Stiavetti*, *supra*, 65 Cal.App.5th at pp. 724–730 [upholding a statewide standing order requiring DSH to provide substantive competency restoration treatment to ISTs within 28 days of service of the commitment packet]; *Loveton*, *supra*, 244 Cal.App.4th at pp. 1043–1044 [court did not violate separation of powers doctrine by setting a 60-day deadline as constitutional " 'outer limit' " for transfer of Contra Costa County IST defendants]; *Aguirre*, *supra*, 64 Cal.App.5th at p. 670 [rejecting argument that sanctions order violated separation of powers by directing executive agency to transfer funds to the judicial branch].)

DSH contends the trial court's order in this case is different than the orders in *Brewer*, *Loveton*, and *Aguirre*, however, because the trial court's "three-day admit-or-treat deadline" is not reasonably tethered to any existing statutory obligations and has no logical connection to the 90-day reporting requirement. We disagree.

Under section 1370, subdivision (a)(1)(B)(i), once the court determines a defendant is IST, the court must order that defendant be delivered to a DSH facility "that will promote the defendant's *speedy* restoration to mental competence."  (Italics added.)  In addition to that requirement, and to the 90-day reporting requirement under section 1370, subdivision (b)(1), the statutory scheme also mandates that a defendant who has regained competence or who is not likely to regain competence be returned to the court within 10 days.  (§§ 1370, subd. (b)(1)(A), 1372, subd. (a)(3)(C).)  Examining

the speedy restoration to competence requirement, the 10-day return requirement, and the 90-day reporting requirement, the trial court here reasonably concluded that "Section 1370 reveals a legislative intent to prevent undue confinement of incompetent defendants who cannot be returned to competence and to promote speedy restoration to mental competence of those who can."

The court also considered these statutory timelines in conjunction with the "entire statutory scheme for criminal defendants, which affords them meaningful rights to prompt adjudication of their cases pursuant to the Sixth Amendment," and compared the timelines under the IST statutory scheme to the timelines in our statutes governing civil commitments, including Welfare and Institutions Code section 5150's requirement that an initial evaluation and intervention occur within 72 hours. Further, the trial court relied on evidence that "[t]he three IST defendants in this case present with a range of disturbing, untreated symptoms and were 'left to waste away in jail' " while awaiting placement, and that their symptoms increased in frequency, duration, and severity while they awaited treatment.[14] The trial court's order also specifically found that DSH had demonstrated its capacity to *treat* IST defendants was not entirely limited by available bed space, because DSH has access to "a number of innovations," including JBCT programs and the ability to offer telehealth services.[15] By setting a three-day deadline for DSH to "[a]t

---

[14] We note DSH challenges none of the court's factual findings on appeal.

[15] DSH submitted evidence that it was already providing comprehensive telehealth and remote mental health services to ISTs who were waiting placement, including ISTs in Solano County, and at the final hearing, stipulated that it would offer telehealth consults for competency treatment. Specifically, counsel told the court: "We are voluntarily saying right now, today, if you, your Honor would like us to agree and stipulate that

29

a minimum," "evaluate defendant's condition and determine whether defendant is suffering from significant cognitive, emotional and/or physical symptoms of his mental illness which will continue or be exacerbated if placement does not immediately occur," and *if so*, "undertake prompt and meaningful efforts to treat defendant's symptoms," the court was acting consistently with the intent of the Legislature to promote the speedy restoration of criminal defendants to competence so that their criminal cases could be adjudicated.

Further, in imposing a short deadline for evaluation and commencement of treatment, the court was considering not just the importance of the statutory mandate for "speedy" restoration of competence and the 90-day reporting requirement but examining IST defendants' due process rights to timely treatment. We have explained above the liberty interest that IST defendants have in being held no longer than reasonable to restore competency, and that their continued restraint must be justified by progress toward that goal. (*Jackson v. Indiana*, *supra*, 406 U.S. at p. 738.) In setting deadlines for treatment and admission of IST defendants, courts properly weigh "the liberty interests of the defendants against the interests of the government." (*Stiavetti*, *supra*, 65 Cal.App.5th at p. 725; *Loveton*, *supra*, 244 Cal.App.4th at pp. 1043–1044 [trial court's setting of transfer deadline based on evidence in the record and balancing of interests did not violate

---

we will offer TeleHealth for psychopharmacological consults, done. DSH is in. We would also say we're offering TeleHealth consults for evaluations remotely, which would be the exact same thing someone would do if they came to a physical location and they would have that evaluation. You want to have that, we will, today, stipulate, agree, and otherwise offer to have TeleHealth evaluations for competency treatment remotely. That is not to say that the full course of treatment can be done remotely. It can not [*sic*]. But we will make that offer and give that today."

separation of powers]; *Craft v. Superior Court* (2006) 140 Cal.App.4th 1533, 1545 [commitment and treatment are intertwined rationales for suspending criminal proceedings against an IST defendant].)  That is precisely what the trial court did here.

As we have explained, we see no indication on this record that the trial court violated separation of powers principles at the time it issued its order requiring DSH to evaluate the condition of IST defendants in its care within 72 hours and undertake prompt and meaningful treatment of any significant symptoms.  That said, as noted above, the Legislature has recently passed and amended legislation establishing a program for the evaluation of IST defendants awaiting admission to DSH facilities.  As we will discuss in the next section, these recent changes do appear to conflict with the 72-hour evaluation and treatment component of the trial court's standing order, and thus require us to vacate those portions of the order and remand for the trial court to reconsider its order in light of the new amendments.

Finally, we reject DSH's argument that the trial court's order requiring DSH to provide weekly reports and a treatment plan to the trial court in the event DSH anticipates it will not be able to place an IST defendant in a DSH facility within 28 days violates separation of powers principles.  DSH asserts that the only statutorily prescribed reports DSH is required to provide the court are the 90-day progress report (§ 1370, subd. (b)(1)), a report every six months thereafter if defendant has not regained competence (*ibid.*), and an evaluation report authorized by Welfare and Institutions Code section 4335.2.  By  requiring a treatment plan and weekly reports, DSH contends the trial court is "rewriting the statutory obligations of [DSH] for all IST defendants in Solano County."

For the reasons we have already addressed, however, we conclude these provisions of the trial court's order do nothing to infringe on the constitutional sphere of the Legislature. First, we agree with the *Stiavetti* court's analysis that the maximum constitutionally permissible time for DSH to delay substantive restoration of competency services is 28 days. (*Stiavetti*, *supra*, 65 Cal.App.5th at p. 730.) DSH does not disagree with this holding, and in fact contends the trial court should be bound by *Stiavetti*. The trial court's order requiring a treatment plan and weekly updates on DSH's progress toward providing constitutionally mandated substantive competency restoration services does nothing to change or impair existing statutory reporting requirements; rather it is an appropriate mechanism to monitor DSH's efforts to comply with the law. (See, e.g., *Trueblood I*, *supra*, 101 F.Supp.3d at pp. 1024–1025 [establishing reporting requirements to ensure compliance with court's injunction].) In placing these requirements, the court is not rewriting the statute, but compelling obedience to the court's judgment protecting IST defendants' constitutional rights to treatment. That is an entirely appropriate exercise of the court's jurisdiction. (*People v. Hahn* (2017) 16 Cal.App.5th 349, 352 [court may compel obedience to lawful orders]; *Fairfield v. Superior Court of Los Angeles County* (1966) 246 Cal.App.2d 113, 120 ["Every court has power '[t]o compel obedience to its judgments, orders and process' in an action or proceeding before it, and to use all necessary means to carry its jurisdiction into effect, even if those means are not specifically pointed out in the code."].)

Moreover, the trial court's requirement that DSH develop and share treatment plans when it will exceed the constitutionally permissible maximum amount of time that an IST defendant can be held without treatment furthers the intent of the Legislature rather than contravenes it.

32

The Legislature has shown that it is concerned with the delays in treatment of IST defendants, by passing legislation authorizing reevaluations of IST defendants and, most recently, eliminating *entirely* any limitation on the amount of time an IST defendant must wait before being considered by DSH for reevaluation.[16] (Stats. 2021, ch. 143, § 351; Stats. 2022, ch. 47, § 53.) Among the legislative goals expressly stated in Welfare and Institutions Code section 4335.2 are: "[t]o reduce the growing list of IST defendants awaiting placement to a department facility for competency restoration treatment," and "[t]o offer expert medication consultation and technical assistance to local sheriffs to support effective use of psychotropic medications and stabilization of IST defendants awaiting placement to a department facility." (Welf. & Inst. Code, § 4335.2, subd. (b)(2), (6).) Moreover, Assembly Bill 133 authorized the creation of an IST Solutions Workgroup, with the express aim of "confront[ing] the crisis of individuals found incompetent to stand trial (IST) . . . in recognition of the importance of these defendants who are committed to the State Department of State Hospitals *to begin receiving competency treatment as soon as practicable . . . .*" (Welf. & Inst. Code, § 4147, subd. (a), italics added.) To that end, the Legislature authorized the IST Solutions Workgroup to consider recommendations that, among other things, "[r]educe the total number of felony defendants determined to be IST," "[r]educe the lengths of stay for felony IST patients," and "[s]upport felony IST defendants to receive early access to treatment before transfer to a restoration of competency treatment program to achieve stabilization and restoration of competency sooner." (*Id.*, subd. (e)(1)–(3).) The trial court's

---

[16] Indeed, DSH notes in its supplemental brief that Senate Bill 184's elimination of the 60-day requirement for reevaluations of IST defendants was "directly responsive to *Stiavetti*'s establishment of 28 days as the 'constitutional outer limit for commencement of substantive services.' "

efforts to compel DSH to comply with a statewide *maximum* constitutional deadline for delivery of substantive competency restoration services is consistent with this legislative intent and does not violate the separation of powers doctrine.

## E. Recent Statutory Changes

As already discussed, in 2021 and 2022, the Legislature enacted new legislation, which, among other things, added section 4335.2 to the Welfare and Institutions Code, allowing DSH to conduct "reevaluations" of IST defendants after the initial commitment order.[17] Under Welfare and Institutions Code, section 4335.2, subdivision (c), DSH has the "authority and sole discretion" to conduct such reevaluations. Moreover, the statute provides, "At the *sole discretion* of the department, the department clinician or contracted clinician may conduct in person, or video telehealth, evaluations of IST defendants at the local jail for those IST patients awaiting admission to the department." (Welf. & Inst. Code, § 4335.2, subd. (c), italics added.) In the first version of this legislation, effective July 27, 2021, DSH was required to conduct such reevaluations only for IST defendants that had been waiting at least 60 days for admission to a DSH facility. (Stats. 2021, ch. 143, § 351.) The 2022 amendment, effective June 30, 2022, eliminated the 60-day requirement and now provides DSH can conduct reevaluations and in-person or telehealth evaluations at any time. (Welf. & Inst. Code, § 4335.2, subd. (c), as amended by Stats. 2022, ch. 47, § 53.) We asked the parties to

---

[17] As DSH explains in its supplemental brief, while the statute uses the term "reevaluations," the assessment performed by DSH constitutes the "first engagement with an IST defendant by DSH personnel." DSH contends the assessment is referred to as a "reevaluation" because all IST defendants awaiting admission to a state hospital have been previously evaluated for competency by local alienists. (See § 1370, subd. (a)(2).) Chunn does not dispute this characterization.

submit supplemental briefing addressing the impact of these provisions on the trial court's standing order in this case.[18]

Both parties agree that the new legislation conflicts with the trial court's order that DSH must evaluate IST defendants within 72 hours of the commitment order.

In interpreting statutory language, our " 'fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.]' [Citation.] 'Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning.' " (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105.) Here, the express language of Welfare and Institutions Code section 4335.2 makes clear that DSH has the "authority and sole discretion" to order reevaluations of IST defendants, including "sole discretion" to conduct in-person or telehealth "evaluations." (Welf. & Inst. Code, § 4335.2, subd. (c).) The plain meaning of this language suggests that DSH has exclusive authority to decide whether, when, and how it will conduct "evaluations" (or "reevaluations"). This clear directive appears to conflict with the trial court's command that DSH "evaluate" defendants within 72 hours of the commitment order.

On the other hand, the trial court made clear in its standing order that it was concerned not just with "the appropriateness of an 'IST waitlist' and placement delays associated therewith" but a separate question not addressed by recent litigation, viz., "Assuming delays in placement following a commitment order to DSH, is DSH responsible for patient care pending

---

[18] After we requested supplemental briefing, the Legislature again amended Welfare and Institutions Code section 4335.2, effective September 29, 2022, but the changes have no impact on the issues raised in this appeal. (Stats. 2022, ch. 738, § 12.)

placement?" (Italics omitted.) The court observed that "[m]ost importantly, *commitment* must include an obligation for DSH to attempt to treat the symptoms and ease the suffering of these IST defendants. If it cannot do so in state hospitals, it must assume prompt responsibility for symptom management in the meantime."

While the new statutory language appears to preclude the trial court from issuing orders that direct DSH to exercise its discretion to conduct evaluations of IST defendants within 72 hours, the trial court may be able to craft other orders that address the needs of IST defendants for ameliorative care pending placement and DSH's responsibility to provide such care once it has received the commitment packet from the court. (See, e.g., *United States v. Brandreth-Gibbs* (W.D.Wn. 2021) 2021 WL 764771 [noting IST defendant was receiving mental health services to stabilize his condition while waiting transfer to appropriate facility; government had obligation "to monitor defendant's condition and take necessary actions to properly care for its ward" while awaiting full competency restoration services].) Accordingly, we reverse the portion of the standing order requiring that DSH evaluate IST defendants within 72 hours and remand for the trial court to consider whether further modification of its standing order is necessary in light of the recent statutory changes.[19] (Code Civ. Proc., § 533 [court may modify or

_____

[19] We note on remand the trial court may also wish to reconsider its order requiring that "placement in a DSH facility must occur within 7 days" if DSH "fails or declines to assess and undertake meaningful treatment . . . within 72 hours . . . ." That aspect of the order does not appear to account for California Code of Regulations, title 9, section 4710, subdivision (a), which requires that IST defendants be admitted from the statewide waitlist based on their date of commitment subject to consideration of specific factors. Although DSH cites this regulation in a footnote in the factual background section of its opening brief, it does not expressly argue the trial court's order conflicted with this regulation, and accordingly, we did not address the issue

dissolve an injunction based on material change in the law]; see *Brewer*, *supra*, 235 Cal.App.4th at pp. 142–143 [remanding for reconsideration of motion to set aside standing order based on changes in the law].)

In his supplemental letter brief, Chunn asserts the trial court properly found the 72-hour evaluation and stabilization treatment provision "is necessary in order to protect the due process rights of IST defendants to freedom from incarceration and to restorative treatment and to ensure that IST defendants are not languishing in conditions that violate 'concepts of dignity, civilized standards, humanity and decency,' " and asks us to determine that Welfare and Institutions Code section 4335.2 is unconstitutional as written to the extent it grants "sole discretion" to the DSH to conduct evaluations.

We decline Chunn's invitation to consider whether Welfare and Institutions Code section 4335.2 is unconstitutional at this late stage in the proceedings when raised for the first time in a supplemental letter brief.[20] (See, e.g., *People v. Punzalan* (2003) 112 Cal.App.4th 1307, 1312 [a supplemental brief is "not the place . . . to try to reframe the issues on appeal"]; *Lagatree v. Luce, Forward, Hamilton & Scripps* (1999)

---

in this opinion. The parties may address this issue as appropriate with the trial court on remand.

[20] We note Chunn cursorily addressed "the recent passage" of Welfare and Institutions Code section 4335.2 in his respondent's brief, but did not raise an argument that the statute was unconstitutional. Nor does Chunn explain in his supplemental brief whether he is asserting a facial or as-applied challenge to the statute. (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [a facial constitutional challenge considers only the text of the measure itself, while an as-applied challenged seeks relief from a specific application of a facially valid statute or an injunction against future application in the allegedly impermissible manner it is shown to have been applied in the past].)

74 Cal.App.4th 1105, 1136, fn. 30 [party cannot raise new issue for first time in supplemental letter brief].) Chunn argues that the only discernible state interest supporting the Legislature's decision to grant DSH sole discretion to determine whether to reevaluate an IST defendant is "to save money and to promote administrative convenience." Of course, DSH has not had an opportunity to brief the issue and we do not know, and will not anticipate, what arguments they might make in this regard. More importantly, in determining the necessity for and scope of relief in issuing a permanent injunction, it is for the trial court in the first instance to weigh the evidence and the competing interests. (*Stiavetti*, *supra*, 65 Cal.App.5th at p. 706.) The trial court is best positioned to reconsider its standing order in light of the substantial changes to the statutory scheme and the *Stiavetti* decision, and it may address any argument properly raised and briefed by the parties about the constitutional impediments to orders it might make at that time. (See, e.g., *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1039 [declining to reach merits of argument about constitutionality of newly amended statute when appellate court was remanding matter to trial court]; *Trueblood II*, *supra*, 822 F.3d at p. 1046 [remanding for trial court to consider effect of state statutory amendment and whether it would "pass constitutional muster"].)

## F. County Jail Conditions

In its opening brief, DSH notes that the trial court's order "provides a detailed, case-specific accounting of how extended confinement in county jail without mental health treatment can adversely affect IST defendants." However, it argues, "the court's concerns about inadequate mental health treatment in the county jail are misdirected in this case, as DSH has neither control over nor responsibility for county jail conditions." DSH then

summarizes the statutory and regulatory obligations imposed on county jails to provide care for IST defendants. In its reply brief, DSH argues that local officials play a critical role in the IST framework and can and should be made to take steps to improve conditions for IST defendants awaiting treatment while in their custody.

It is not clear to us what DSH is arguing. The condition of IST defendants in county jail awaiting treatment is highly relevant to the issues in this case. (See, e.g., *Stiavetti*, *supra*, 65 Cal.App.5th at p. 725 [discussing effect of prolonged incarceration in county jails while awaiting treatment, which often delays return to competence]; *Oregon Advocacy Center v. Mink*, *supra*, 322 F.3d at pp. 1106–1107, 1120 [discussing "the most relevant undisputed findings" regarding conditions in county jail and summarizing harms IST defendants suffer in county jail while awaiting admission to state hospital]; *Trueblood I*, *supra*, 101 F.Supp.3d at pp. 1017–1018 [discussing deleterious effect of correctional environment on people with confirmed or suspected mental illness and how prolonged incarceration exacerbates mental illness].) To the extent DSH contends "the court's concerns about inadequate mental health treatment in the county jail are misdirected," we see no indication that the trial court imposed inappropriate orders based on those concerns or otherwise abused its discretion, nor does DSH point to any specific portion of the order reflecting that it did. To the extent DSH argues local jail officials must perform their statutory and regulatory duties, that is outside the scope of this proceeding. The trial court did not abuse its discretion by discussing in its standing order the conditions of IST defendants in county jail awaiting competency restoration treatment.

## G. *Sanctions*

In its standing order, the trial court ordered the imposition of monetary sanctions of up to $1,500 per day against DSH for noncompliance with its order pursuant to Code of Civil Procedure section 177.5. DSH argues this was error because the language, legislative history, and judicial interpretations of section 177.5 indicate that sanctions are limited to $1,500 for each individual IST defendant, not $1,500 each *day* for each defendant. Chunn "reluctantly agrees."

" ' " 'As in any case involving statutory interpretation, our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning.' " ' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) If the language of the statute is clear and unambiguous, there is no need for judicial construction and our task is at an end. If the language is reasonably susceptible of more than one meaning, however, we may examine extrinsic aids such as the apparent purpose of the statute, the legislative history, the canons of statutory construction, and public policy. (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 838; *People v. Arias* (2008) 45 Cal.4th 169, 177.)

Code of Civil Procedure section 177.5 states: "A judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification." On its face, the plain language of the statute limits a sanctions award to $1,500 and does not include any reference to successive, per-day sanctions or state whether each day of noncompliance with a court order would allow for a separate violation

within the meaning of the statute. (See 2 Witkin, Cal. Procedure (6th ed. 2022 Update) Courts, § 228 [Code Civ. Proc., § 177.5 authorizes "reasonable sanctions, up to $1,500 . . . for any violation of a lawful court order" by a witness, party, or party's attorney]; cf. Civ. Code, § 789.3, subd. (c)(2) ["Any landlord who violates this section shall be liable to the tenant in . . . [¶] . . . [¶] . . . [a]n amount not to exceed one hundred dollars ($100) for each day or part thereof the landlord remains in violation of this section."]; Pub. Util. Code, § 2108 ["Every violation of the provisions . . . of any order . . . of the commission, by any corporation or person is a separate and distinct offense, and in the case of a continuing violation each day's continuance thereof shall be a separate and distinct offense."].)

In *People v. Hooper*, *supra*, 40 Cal.App.5th 685, Division Four of this District considered whether the trial court could impose daily monetary sanctions under Code of Civil Procedure section 177.5 against DSH to compensate the county for the costs of housing IST defendants when DSH failed to admit IST defendants within 60 days. (*Hooper*, at p. 690.) There, the trial court had imposed 11 written sanctions orders of $1,500 each for 11 defendants, resulting in a total of $16,500 in sanctions. (*Id.* at p. 688.) The *Hooper* court determined that under the statute, the amount of the sanction only needed to be "reasonable and within the $1,500 limit" of section 177.5. (*Hooper*, at p. 695.) Because the trial court's orders did not exceed the statutory maximum of $1,500 and DSH failed to show they were unreasonable, the court upheld the sanctions. (*Ibid.;* see *Kareem A.*, *supra*, 46 Cal.App.5th at pp. 69, 81 [affirming sanctions award of $1,500 per defendant against DSH for delays in admitting IST defendants]; *Aguirre*, *supra*, 64 Cal.App.5th at pp. 658, 670 [upholding $34,000 sanctions award as to 31 defendants in San Joaquin County].)

41

As both parties agree, to the extent the statutory language is ambiguous, the legislative history suggests that the Legislature intended to strictly limit the amount of sanctions permitted under the statute to $1,500.[21] In the original draft of Assembly Bill No. 3573 (1981–1982 Reg. Sess.) (Assem. Bill 3573), the proposed statutory language did not include any limitation on the amount of sanctions the court could order. (Assem. Bill 3573, § 1, as introduced Mar. 15, 1982.) Thereafter, the Assembly amended the bill to include the $1,500 limit. (Assem. Amend. to Assem. Bill 3573 (1981–1982 Reg. Sess.) May 3, 1982, § 1.)

Further, a Senate Judiciary Committee report analyzing Assembly Bill 3573 discussed existing options for enforcement of courtroom rules. One of the options it highlighted was "[c]oercive contempt," which aims to correct bad acts or omissions that violate court orders. (Sen. Com. on Judiciary, Analysis of Assem. Bill 3573 (1981–1982 Reg. Sess.) as amended May 3, 1982, pp. 3–4.) This was typically done, the report explained, "through imposition of a fine of so-much-per-day until the contemnor agrees to obey." (*Id.* at p. 4.) However, despite this reference to per-day contempt sanctions, the report does not indicate that Code of Civil Procedure section 177.5 was to operate in a similar fashion. (Sen. Com. on Judiciary, Analysis of Assem. Bill 3573, *supra*, p. 4.) To the contrary, the report repeatedly referenced the proposed statute's plain language, noting that sanctions would be permissible "up to $1,500." (*Id.* at pp. 5, 7.)

---

[21] DSH filed a request for judicial notice, which Chunn has not opposed, asking that we take judicial notice of the certain documents pertaining to the legislative history of Code of Civil Procedure section 177.5. We grant the unopposed request for judicial notice. (Evid. Code, §§ 452, subds. (c) & (h), 459, subd. (a).)

In light of the plain language of the statute, judicial interpretations, and the legislative history, we conclude the trial court's order must be modified to limit any sanctions under Code of Civil Procedure section 177.5 to $1,500 per defendant, not $1,500 per day.

## H. Remand

Although we must remand this matter for the trial court to modify and reconsider aspects of its ruling, we recognize and appreciate the substantial time and careful effort the court put into these proceedings and its thorough and thoughtful written order.

As we have already noted, the trial court's standing order must be modified in at least two respects. First, paragraph 1 on page 33 of the standing order issued February 26, 2021, should be modified to state that "each Solano County IST defendant shall be deemed committed to the care of DSH upon receipt by DSH of the commitment packet described in Penal Code section 1370, subdivision (a)(3), whether or not the packet is complete." (See *Stiavetti*, *supra*, 65 Cal.App.5th at pp. 721–723.) Second, the court may not, consistent with Code of Civil Procedure section 177.5, impose sanctions of up to $1,500 *per day* for violation of its order, but may only impose sanctions of up to $1,500 per IST defendant.

Beyond these modifications, we have also discussed that recent statutory changes require the trial court to reconsider other aspects of its standing order. We conclude that the court is precluded from ordering DSH to evaluate IST defendants within 72 hours of transfer of responsibility to DSH based on language in Welfare and Institutions Code section 4335.2 that gives DSH "authority and sole discretion" to conduct reevaluations of IST defendants. (Welf. & Inst. Code, § 4335.2, subd. (c).) Accordingly, we vacate paragraphs 2 and 4 on page 33 of the standing order. We will remand,

43

however, for the trial court to reconsider whether additional changes to its standing order may be appropriate, taking into account the 28-day maximum constitutional limit for the commencement of substantive competency restoration services announced in *Stiavetti* and the recent amendments to the statutory scheme granting DSH "authority and sole discretion" to conduct reevaluations. As we have noted, the trial court may consider whether there are additional orders it may make, consistent with the statutory scheme and constitutional due process, to ensure that DSH is fulfilling its obligations with respect to care and ameliorative treatment for IST defendants awaiting the commencement of substantive competency restoration services. Finally, we affirm those aspects of the trial court's order regarding specific steps DSH must take when placement in a DSH facility is not anticipated to occur within 28 days of the transfer of responsibility, including development of a written remediation plan to actively treat significant symptoms, continuation of such treatment, and weekly written reporting as outlined in paragraphs 5 to 7 on pages 33 and 34 of its standing order.

## III. DISPOSITION

The judgment is affirmed in part, reversed in part, and the case is remanded for reconsideration and modification of the standing order in light of the statewide constitutional deadline announced in *Stiavetti* and the relevant statutory changes as discussed in this opinion.

MARGULIES, ACTING P. J.

WE CONCUR:

BANKE, J.

DEVINE, J.*

A162583
*In re Chunn*

---

&ast; Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:       Solano County

Trial Judge:       Hon. Daniel J. Healy

Counsel:

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Kevin L. Quade, Deputy Attorneys General for Appellant Department of State Hospitals.

Michele E. Kemmerling for Petitioner and Respondent.